**AMERICAN SAVINGS & LOAN ASSO-CIATION OF FLORIDA, Plaintiff,**

v.

**PEMBROKE LAKES REGIONAL CENTER ASSOCIATES, LTD.,**
**Defendant–Appellee,**

**C.F. Pembroke Associates,**
**Defendant–Appellant.**

No. 89–5656.

United States Court of Appeals,
Eleventh Circuit.

Aug. 10, 1990.

As Amended Sept. 21, 1990.

---

* Honorable Wesley E. Brown, Senior U.S. District Judge for the District of Kansas, sitting by

Thomas J. Ansbro, Jr., Goldberg & Young, William Berger, Ft. Lauderdale, Fla., for defendant-appellant.

Richard L. Lapidus, Miami, Fla., for defendant-appellee.

Before JOHNSON and CLARK, Circuit Judges, and BROWN *, Senior District Judge.

JOHNSON, Circuit Judge:

This case arises on appeal from the district court's entry of a directed verdict in

designation.

favor of Pembroke Lakes Regional Center Associates, Ltd. ("Lakes"), 711 F.Supp. 1072.

## I. FACTS

### A. *Background*

This case involves a contract for the sale of land for construction of a shopping mall. In 1971, Pembroke Homes, Inc. ("Homes") purchased 1547 acres in the village of Pembroke Pines. Homes developed most of the land with single-family homes, but reserved 247 acres for investment. Homes transferred this land to Pembroke Lakes, Ltd. ("PLL"), a Florida limited partnership.

In 1984, Cadillac Fairview, Inc. ("Cadillac") approached PLL about developing a shopping mall on the 247 acres through a joint venture. In the spring of 1984, Cadillac and PLL signed a non-binding letter of intent to enter into the joint venture.[1] In the fall of 1984, however, PLL notified Cadillac that it did not wish to go forward with the joint venture. Notwithstanding PLL's notice, the parties continued to negotiate, and Cadillac eventually offered to purchase ninety-five acres of the land for $12,500,000 so that Cadillac could develop the mall on its own. Cadillac formed CF–Pembroke Associates ("CFP"), a New York limited partnership, to enter into the contract. Similarly, PLL formed Pembroke Lakes Regional Center Associates, Inc. ("Lakes"), a Florida limited partnership, to enter into the contract.

On June 13, 1985, CFP and Lakes entered into an Agreement of Sale ("the agreement") under which CFP would purchase the ninety-five acres for $12,500,000.

Article Twelfth of the agreement, "Special Closing Conditions," provided the following:

> There has heretofore been prepared by [Lakes] a master plan entitled "Conceptual Site Plan Pembroke Lakes Regional Center", dated May 24, 1985 and prepared by Gee & Jenson for the Land and the peripheral area....[2] The plan and the criteria set forth in this paragraph A are collectively referred to as the "Plan."
>
> B. [Lakes] agrees that it shall diligently and continuously, using reasonable efforts, at its own cost and expense, take all action necessary to (i) obtain approval of the Plan by all governmental authorities having jurisdiction, (ii) obtain all rezoning and zoning variances which may be necessary to permit development of the Premises as a regional shopping center in accordance with the Plan ... (iii) prepare, file and obtain all approval of any and all required environmental statements and reports necessary to permit development of the Premises ... in accordance with the Plan and (iv) obtain any subdivision plat approval necessary to permit development of the Premises as a regional shopping center ... in accordance with the Plan and record the same.

CFP deposited $2,000,000 of the purchase price into an escrow account at American Savings & Loan Association of Florida ("American") as a contract deposit under Article Second of the agreement.

Lakes spent over one year obtaining approvals of the conceptual site plan from various government entities. Cadillac monitored the process in three ways: (1) through an engineering firm, Pharr & Associates, that Cadillac hired in Atlanta, (2) through Cadillac's architects, RTKL, and

---

**1.** The letter provided in part:

> It is intended that title to the Property will remain as is until such time that all approvals have been obtained so as to permit the filing of an application for a building permit for a regional shopping center, it being PLL's responsibility to attempt to obtain all such necessary approvals.

The letter further provided that once the necessary approvals were obtained the property would be conveyed to the joint venture, and Cadillac and PLL would jointly control the property's development, including drawing plans and determining when to begin construction.

**2.** The conceptual site plan eventually approved by regional and local authorities in this case was dated November 1985, but was virtually identical to the May 24, 1985 plan.

(3) through Cadillac's Vice–President in charge of the project, David Schwartz. At no time during the year did Cadillac object that Lakes was not seeking the proper government approvals.

Lakes filed an application for approval of a development of regional impact and obtained a Development Order permitting construction of a shopping center on the land from the South Florida Planning Council. *See* Fla.Stat.Ann. § 380.06(10) (development of regional impact application must be approved by regional planning agency). Lakes also obtained plat approval from Broward County. Finally, the City of Pembroke Pines ("the City") passed an ordinance approving the shopping center and the conceptual site plan. *See* Fla.Stat.Ann. § 380.06(6), (11) (development of regional impact application must be approved by the local government zoning authorities).

On July 15, 1986, Lakes notified CFP that all of the special closing conditions had been met and that Lakes had scheduled the closing for August 15, 1986. CFP responded with a letter giving six reasons why the special closing conditions had not been met. On August 19, 1986, counsel from both sides met in an attempt to resolve the matter. This attempt was unsuccessful, and the meeting broke up after CFP refused to close. On August 22, 1986, Lakes tendered a deed to CFP, and CFP refused the tender. On August 27, 1986, CFP wrote Lakes that the agreement was cancelled because Lakes had breached the agreement. CFP's letter demanded return of the deposit in the American escrow account.[3]

### B. *Proceedings Below*

On September 5, 1986, American filed an interpleader action in Florida state court, naming both CFP and Lakes as claimants of the escrow account. Lakes filed a crosscomplaint against CFP, and the Florida court dismissed American from the case. CFP then petitioned for removal to the district court.

On April 4, 1988, Lakes filed a motion for summary judgment. In an order dated August 23, 1988, the district court denied the motion. The court found that the language in Paragraph Twelfth of the agreement requiring Lakes to obtain all governmental approvals was ambiguous and that its interpretation should be left to the jury. The court also found that there were genuine issues concerning the parties' intent.

The Court held a jury trial on April 4–11, 1989. At the close of all evidence, both parties moved for a directed verdict, and the court granted Lakes' motion. The court found that the special closing conditions in Article Twelfth of the agreement did not obligate Lakes to obtain site plan approval so as to permit the filing of applications for building permits.[4] Finding that Lakes was obligated to obtain approval only of the conceptual site plan, and that Lakes had obtained that approval, the court determined that CFP was in default under the agreement.

The court explained that it had denied Lake's motion for summary judgment because the deposition of CFP's attorney, Kenneth Kraus, stated that during the negotiations Lakes assured CFP that Lakes would obtain all approvals necessary for obtaining building permits. The court also

---

**3.** Cadillac had spent two years unsuccessfully soliciting major retailers to be "anchor tenants" at the proposed mall. At the time that Lakes notified CFP that the closing was to be on August 15, 1986, CFP had not found a single tenant for the mall. In the shopping mall development industry, anchor tenants have the power to specify how their store will be designed and constructed. Accordingly, most developers do not design the mall until the anchor tenants have submitted their designs. The developers then build the mall around the anchor tenants' plans. While Cadillac previously had purchased mall sites without commitments from anchor tenants, it never had begun construction of a mall without anchor tenants.

**4.** At trial, CFP stipulated that Lakes had met all of the special conditions except the requirement that the plan be approved by the governmental authorities having jurisdiction.

had relied on CFP's statement in opposition to summary judgment that the joint venture letter of intent carried over to the agreement. The court stated that Kraus's trial testimony did not indicate that Lakes promised to obtain all approvals necessary to apply for building permits. The court also found that the parties had agreed during negotiations to drop from the final agreement the provision in the letter of intent obligating Lakes to obtain all approvals necessary to apply for building permits. Finally the court rejected CFP's argument that because there was no formal process by which the conceptual site plan standing alone could be approved by the city, Lakes failed to obtain all necessary approvals. The court found that because Lakes obtained approvals from all government entities having jurisdiction, Lakes fulfilled the special conditions of closing.

In this appeal, we consider whether the district court erred in granting Lakes a directed verdict.

## II. STANDARD OF REVIEW

When reviewing a district court's grant of a directed verdict, this Court must consider all of the evidence in the light most favorable to the party opposing the motion and ask whether the facts and inferences point so strongly and overwhelmingly in favor of the moving party that no reasonable person could fail to find for the moving party. *Garmon v. Lumpkin County, Ga.*, 878 F.2d 1406, 1408 (11th Cir.1989). Under Florida law, whether a contract is ambiguous is a question of law to be deter-

mined by the court. *Vienneau v. Metropolitan Life Ins. Co.*, 548 So.2d 856, 859 (Fla.Dist.Ct.App.1989); *Specialty Restaurants Corp. v. Miami*, 501 So.2d 101, 103 (Fla.Dist.Ct.App.1987). If the wording of a contract is ambiguous, and the parties present different interpretations, the issue of interpretation becomes one of fact. *Allen C. Ewing & Co. v. Freedle*, 521 So.2d 384, 386 (Fla.Dist.Ct.App.1988); *Multitech Corp. v. St. Johns Bluff Inv.*, 518 So.2d 427, 431 (Fla.Dist.Ct.App.1988).

## III. ANALYSIS

### Contract Claims

CFP argues that the district court erred in determining that the agreement was unambiguous and in improperly weighing the evidence of intent, usurping the jury's function.[5] Lakes argues that the contract was unambiguous and that the trial testimony demonstrates that there was no issue regarding the parties' intent.

There are two types of "site plans" in the construction industry. A conceptual site plan shows no buildings or improvements. It is simply an outline of the property and surrounding areas together with a description of proposed density and use (e.g., commercial, industrial, or residential). A detailed site plan shows the actual locations of buildings, building elevations, setbacks, and other details of construction. Woodward Hampton, the City Manager for the City, testified that final approval of a detailed site plan is part of the process of applying for building permits. CFP's en-

---

**5.** In support of its argument, CFP cites the district court's earlier decision denying summary judgment because the contract was ambiguous and because there were genuine issues regarding the parties' intent. It is well settled in this Circuit, however, that the denial of a motion for summary judgment does not rule out the possibility of a subsequent directed verdict. *Gross v. Southern R.R. Co.*, 446 F.2d 1057, 1060 (5th Cir.1971); *see also Jones v. Wike*, 654 F.2d 1129, 1130 (5th Cir. Unit B 1981) (per curiam) (dis-

trict court did not err in reconsidering its initial order denying summary judgment in light of new evidence); *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*) (adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981); *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33, 34 (11th Cir.1982) (adopting as binding precedent all decisions of Unit B of the former Fifth Circuit).

tire case consists of an attempt to blur the distinction between these two types of site plans. The agreement, however, makes clear that the parties intended Lakes to obtain approval only of a conceptual site plan.

Article Twelfth of the agreement provides the following definition of the term "plan:"

> There has heretofore been prepared by [Lakes] a master plan entitled "Conceptual Site Plan Pembroke Lakes Regional Center", dated May 24, 1985 and prepared by Gee & Jenson for the Land and peripheral area.... The plan and the criteria set forth in this paragraph A are collectively referred to as the "Plan".

Every special condition set out in the following paragraph refers to "the Plan," which clearly means the conceptual site plan prepared by Gee & Jenson. Accordingly, CFP's references to approvals of other types of "site plans" are irrelevant to the question of whether Lakes fulfilled the special closing conditions.[6] The special condition that CFP claims was not fulfilled (that Lakes "obtain approval of the Plan by all governmental authorities having jurisdiction") obligated Lakes to obtain approval only of the conceptual site plan. CFP's

counsel conceded at oral argument that the city approved this plan.[7] Accordingly, Lakes fulfilled the special closing conditions.

CFP nevertheless argues that the testimony at trial established without contradiction that the parties intended approval of the conceptual site plan to be sufficient to obtain detailed site plan approval, leading to the issuance of building permits. Because the conceptual site plan was not sufficient to obtain detailed site plan approval, CFP argues, Lakes had an obligation to submit more detailed plans for approval.

The testimony at trial did not support CFP's theory of the parties' intent. Kraus was CFP's attorney during the negotiations. He testified that the conceptual site plan would not be adequate for detailed site plan approval in any jurisdiction. Cadillac's Vice President in charge of the project was David Schwartz. Schwartz had been involved in twelve shopping center developments for Cadillac. He testified that he did not know of any jurisdiction where a developer could obtain site plan approval, for the purposes of obtaining building permits, by submitting a plan, such as the conceptual site plan, that

---

6. CFP argues that Article Fifth of the agreement provides separate conditions precedent to closing. Article Fifth (A)(1)(iv) provides as a condition precedent to closing that, "the Seller has taken all actions and obtained all consents and approvals required for the consummation of the transaction contemplated by this Agreement...." This passage refers to other portions of the agreement. Article Twelfth deals with government approvals. Accordingly, when Lakes satisfied the special conditions outlined in Article Twelfth it also satisfied the conditions precedent in Article Fifth. Under Florida law, moreover, where a contract contains specific and general clauses, the general clauses must yield to the specific clauses. *Wooten v. Wooten,* 510 So.2d 1033, 1034 (Fla.Dist.Ct.App.1987); *Cypress Gardens Citrus Prods., Inc. v. Bowen Bros., Inc.,* 223 So.2d 776, 778 (Fla.Dist.Ct.App.1969). In the present case, Article Twelfth contains specific clauses, and therefore Article Twelfth determines Lakes' responsibilities in obtaining approvals.

7. CFP's counsel, William Berger, had the following colloquy with the Court at oral argument:

> BERGER: I say that the City of Pembroke Pines did not approve the conceptual site plan attached to the agreement. And as evidence I cite to the letter of Mr. Hampton: Exhibit 29.
>
> JOHNSON, J: Did they pass an ordinance approving the shopping center and the conceptual site plan? Not the one attached, but the conceptual site Plan?
>
> BERGER: Not the one attached to the agreement.
>
> JOHNSON, J.: I understand that.
>
> BERGER: It approved in concept, yes, the conceptual site plan.
>
> JOHNSON, J: Well, that's what a conceptual site plan's all about, isn't it?
>
> BERGER: Yes, yes.

showed no buildings. In sum, the evidence is overwhelming that the parties knew that building permits could not be obtained on the basis of the conceptual site plan, which was the only plan for which Lakes was obligated to seek approvals. Accordingly, we hold that the district court did not err in determining that no reasonable person could find that the parties intended that Lakes obtain final site plan approval.

CFP also argues that because municipal approval procedures in the city did not include any mechanism for approving the conceptual site plan, Lakes did not obtain the approvals called for in Article Twelfth. CFP, however, does not indicate what approval Lakes failed to obtain. The City Manager and City Planner testified that the conceptual site plan was approved under Fla.Stat.Ann. § 380.06, which provides for municipal approval of developments of regional impact. Municipal law did not provide for any other types of municipal approvals of the conceptual site plan. Accordingly, Lakes did obtain all required municipal approvals.[8]

## IV. CONCLUSION

We AFFIRM the district court's directed verdict. We also DIRECT Lakes to file an affidavit of attorney's fees incurred in this action.

---

**8.** This argument appears to be another attempt by CFP to argue that the agreement required Lakes to submit detailed site plans in order to obtain all approvals necessary for the issuance of building permits. Because the agreement contemplated only the submission of the conceptual site plan, we reject this argument.