**Gerald Anthony COLEMAN, Petitioner–Appellant,**

v.

**Harry K. SINGLETARY, Robert A. Butterworth, Respondents– Appellees.**

No. 92–3317.

United States Court of Appeals, Eleventh Circuit.

Sept. 8, 1994.

Mark Allan Pizzo, Asst. Federal Public Defender, Tampa, FL, for appellant.

Peggy Ann Quince, Stephen A. Baker, Asst. Attys. Gen., Tampa, FL, for appellees.

Before CARNES, Circuit Judge, FAY and JOHNSON, Senior Circuit Judges.

CARNES, Circuit Judge:

Gerald Anthony Coleman appeals from the district court's order denying his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. At Coleman's trial, the evidence against him included statements he made to two detectives shortly after his arrest. On appeal, Coleman raises two issues that merit discussion. First, he contends that the detectives continued to interrogate him after he invoked his Fifth Amendment right to remain silent, and that his subsequent statements were therefore inadmissible. Second, he contends that his waiver of his *Miranda* rights was ineffective because of his youth and mental illness. For the reasons that follow, we affirm.

## I. BACKGROUND

Coleman was convicted by a Sarasota County jury of the second-degree murder of his ten-year-old sister, a crime committed when he was fifteen years old. He was sentenced to forty years imprisonment. The Second District Court of Appeal affirmed Coleman's conviction and sentence. *Coleman v. State,* 515 So.2d 313 (Fla.Dist.Ct.App. 1987). His writ of certiorari to the Supreme Court of Florida was denied. *Coleman v. State,* 523 So.2d 576 (Fla.1988).

Coleman filed a petition for habeas corpus in the United States District Court for the Middle District of Florida, arguing that his confession was obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The district court denied the petition.

The facts in this case are undisputed. On January 18, 1984, when Coleman returned home from school, he decided to kill his father. He therefore asked his sister to leave the house; she declined to do so and instead went to her bedroom to play with a stuffed animal. Coleman picked up a knife and followed his sister into her bedroom, telling her he was going to kill her. After backing her into a closet with the knife, Coleman strangled her with his hands for a few minutes. She started to breath again after he relaxed his grip, so he strangled her again until his hands grew tired. Then he knotted a belt around her neck. When he was finished, he wrapped her dead body in a blanket and placed it in the closet next to the teddy bear with which she had been playing. He then rode his bicycle to a store where he bought himself candy and a soft drink.

Upon his return, Coleman called a suicide counseling center and reported that he had killed his sister. He then went out again. A police officer found him in the neighborhood, arrested him, and read him the *Miranda* warnings, after which Coleman told the officer that he had strangled his sister. Coleman was taken to the Sarasota County Sheriff's Office, where he was questioned by Detective Paul Rigney and Detective–Sergeant Dario Valente. Rigney advised Coleman of his *Miranda* rights again; Coleman responded that he understood his rights and that he was willing to talk; he then confessed for the second time that he had killed his sister.

Rigney and Valente then turned on a tape recorder to record the interrogation. At the beginning of the recorded segment, they informed Coleman of his *Miranda* rights once more, which was the third time he had heard them that day. Coleman again expressed his willingness to talk, and for the third time confessed that he had strangled his sister. A few minutes later, the interrogation was interrupted when the detectives received a telephone call from Freda Pflaum, a public defender who was notified of Coleman's arrest by the Florida Department of Health and Rehabilitative Services. The detectives told Coleman that the public defender asked them to "cease any further interview at this time"; they then turned off the tape recorder.

The detectives put public defender Pflaum in contact with Assistant State Attorney Douglas Spangler. When Pflaum said that she intended to instruct Coleman not to answer any more questions, Spangler told her that she could not talk to Coleman on the telephone, but that she could see him if she drove to the station. Pflaum declined to do so. Coleman was not informed that Pflaum had said she intended to instruct him not to answer any more questions.

Rigney and Valente then turned the tape recorder back on and resumed their interrogation. Shortly afterwards, the following exchange took place:

*Valente:* "And what you're saying, or what you're about to say you're going to do of your own free will; is that correct?"

*Coleman:* "Yes. Unless, what about that one guy, though?"

*Valente:* "What guy?"

*Coleman:* "The guy—"

*Rigney:* "Public defender."

*Coleman:* "Yeah."

*Valente:* "Okay."

*Rigney:* "I explained to him what the public defender was—"

*Valente:* "Okay. Tony, do you feel that you want to have a public defender?"

*Coleman:* "I don't know. But if he said to stop it I don't want to do what he said not to do."

*Valente:* "All right. Well, do you have any objections to talking to us? It's up to you. Now, again, you know what our job is. We need to know what happened, and that's basically it. But we don't want to do anything, we don't want to force you to do anything that you don't want to do. If ·you want to talk to [us], fine, we'll continue with the conversation. You can stop any time you want to stop. You can ask us any questions, but it's up to you. If you want to talk to us we'll listen. If you want us to stop asking you any questions, we'll do that."

*Coleman:* "I guess if that guy thinks it's all right, I don't care."

The detectives asked Coleman no more questions about the killing for the next several minutes. Instead, they asked him whether he wanted to continue the interrogation. At no point did Coleman say either that he wanted to stop talking or to speak to an attorney. Finally, when Valente asked, "Do you want to talk to us alone, or do you want to have somebody with you?", Coleman said, "I want to talk." Valente asked Coleman if he was sure; Coleman said that he was. The detectives resumed asking questions about the killing. Coleman then admitted that he knew the difference between right and wrong, and that what he had done to his sister was "terribly wrong."

At trial, Coleman raised the insanity defense. Three psychiatrists testified that they thought he was sane when he killed his sister; two testified that they thought he was insane at the time of the killing. The taped confession was played for the jury. During closing argument, the prosecutor pointed to Coleman's admission that his actions were "terribly wrong" and argued that that indicated he was sane. Coleman had made that admission only during his third confession, and only after he had made the comment in question about whether to invoke his *Miranda* rights.

Coleman's motion to suppress the confession was denied. In his habeas petition, he argued that the failure to suppress was in error because his confession was involuntary, and because the interrogating officers continued to question him, in violation of *Miranda,* after he indicated that he wished to remain silent. The federal magistrate disagreed, and the district court adopted the magistrate's recommendation as the opinion of the court. Coleman appeals, raising the same issues.

## II.  DISCUSSION

We first address Coleman's contention that the interrogating officers ignored his invocation of his *Miranda* rights, and consider whether Coleman's statement was sufficient to invoke his right to remain silent. We then discuss Coleman's argument that he never voluntarily and intelligently waived his *Miranda* rights.

### A.  WHETHER THE POLICE VIOLATED COLEMAN'S RIGHT TO REMAIN SILENT

█  The Supreme Court, in *Miranda v. Arizona,* 384 U.S. 436, 473–74, 86 S.Ct. 1602, 1627–28, 16 L.Ed.2d 694 (1966), held that under the Fifth Amendment when a person undergoing a custodial interrogation "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." On appeal, Coleman argues that his response to Valente's question about whether he wanted to have a public defender constituted an unequivocal invocation of his right to remain silent. His exact words were: "I don't know. But if he said to stop it I don't want to do what he said not to do." Reviewing *de novo* the district court's application of the law to the undisputed facts of this case, *United States v. Mendoza–Cecelia,* 963 F.2d 1467, 1471 (11th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 436, 121 L.Ed.2d 356 (1992), we disagree with Coleman's contention. Coleman's statement was insufficiently clear to invoke his right to remain silent.

Before the Supreme Court's recent decision in *Davis v. United States,* —— U.S. ——, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), the rule in this Circuit was that: "When a defendant makes an equivocal request for an attor-

ney during a custodial interrogation, 'the scope of that interrogation is immediately narrowed to one subject and one only. *Further questioning thereafter must be limited to clarifying that request* until it *is* clarified.' " *Owen v. Alabama,* 849 F.2d 536, 539 (11th Cir.1988) (quoting *Thompson v. Wainwright,* 601 F.2d 768, 771 (5th Cir.1979) (emphasis in original)); *accord Mendoza–Cecelia,* 963 F.2d at 1472. We applied the same rule to equivocal invocations of the right to cut off questioning: "[W]here an individual in custody makes an equivocal invocation of his right to remain silent, further questioning must be restricted to clarifying that request until it in fact is clarified, and no statement taken after the request but before the clarification can clear the *Miranda* hurdle." *United States v. Pena,* 897 F.2d 1075, 1081 (11th Cir.1990) (citing *Martin v. Wainwright,* 770 F.2d 918, 924 (11th Cir.1985), *modified,* 781 F.2d 185 (11th Cir.), *cert. denied,* 479 U.S. 909, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986)); *accord United States v. Ramsey,* 992 F.2d 301, 305 (11th Cir.1993).

However, our prior decisions must yield to supervening decisions of the Supreme Court. *E.g., Myrick v. Freuhauf Corp.,* 13 F.3d 1516, 1521 (11th Cir.1994) ("It is the law of this Circuit that we are bound by a prior panel's decision except to the extent it is altered by a supervening Supreme Court decision, which we will, of course, follow instead.") *Davis* is a supervening decision which changes our "clarification only" rule. In *Davis,* the Supreme Court held that, "[a]lthough a suspect need not speak with the discrimination of an Oxford don, he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." —— U.S. at ——, 114 S.Ct. at 2355 (internal quote marks and citation omitted). "If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." *Id.* at ——, 114 S.Ct. at 2356. Although recognizing that "it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney," the Court pointedly declined to adopt a rule requiring that

officers ask clarifying questions. *Id.* "Unless the suspect actually requests an attorney, questioning may continue." *Id.*

■ Because we are bound to follow the Supreme Court's holding in *Davis,* our decisions creating a duty to clarify a suspect's intent upon an equivocal invocation of counsel are no longer good law. Furthermore, we have already recognized that the same rule should apply to a suspect's ambiguous or equivocal references to the right to cut off questioning as to the right to counsel. *Martin v. Wainwright,* 770 F.2d 918, 924 (11th Cir.1985) ("We see no reason to apply a different rule to equivocal invocations of the right to cut off questioning."), *modified on other grounds,* 781 F.2d 185 (11th Cir.), *cert. denied,* 479 U.S. 909, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986). The Supreme Court's concern in *Davis* was to craft "a bright line that can be applied by officers in the real world of investigation and interrogation without unduly hampering the gathering of information." —— U.S. at ——, 114 S.Ct. at 2352. The Court rejected a rule requiring that police cease questioning a suspect after an ambiguous or equivocal invocation of his *Miranda* rights out of a fear that the "clarity and ease of application" of the bright line rule "would be lost." *Id.* Because this concern applies with equal force to the invocation of the right to remain silent, and because we have previously held that the same rule should apply in both contexts, we hold that the *Davis* rule applies to invocations of the right to remain silent. A suspect must articulate his desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent. If the statement is ambiguous or equivocal, then the police have no duty to clarify the suspect's intent, and they may proceed with the interrogation.

We conclude, as did the magistrate judge and the district court judge, that Coleman's statement—"I don't know. But if he said to stop it I don't want to do what he said not to do."—is equivocal. Our conclusion is consistent with the closest precedent of this Court that we have found. During interrogation in *United States v. Mendoza–Cecelia,* 963 F.2d

1467, 1472 (11th Cir.1992), the suspect said: "I don't know if I need a lawyer, maybe I should have one, but I don't know if it would do me any good at this point." This Court held that that statement was equivocal. *Id.*

In concluding that Coleman's statement was equivocal, we disagree with the dissent about whether Coleman, when he made the statement in question, knew that the public defender had said he should not talk any more. The record does not indicate that Coleman knew anything more than that the public defender had called earlier, spoken to one of the detectives, and in the words of that detective, requested that the detectives "cease any further interview *at this time.*" (Emphasis added.) It was only after a sixteen-minute break, during which there was communication between the public defender and the assistant state attorney, that the detectives resumed questioning Coleman.

■ Coleman himself apparently did not interpret anything the detectives had told him about the public defender's call to be advice that Coleman should stop talking to the detectives. The next statement Coleman made after the statement in question, referring to the public defender, was: "I guess if that guy thinks it's all right, I don't care."[1] If Coleman had known that the public defender did not want him to talk anymore, the very next words out of Coleman's mouth would not have reflected a belief that the public defender thought it was all right for him to *continue* talking.

Our reading of the record concerning the extent of Coleman's knowledge comports with the interpretation of that record by Coleman's own attorney. During oral argument, Coleman's attorney conceded:

> From my review of the record, there is not any instance in which the police officers tell the petitioner that his public defender

called and that his public defender told them that he did not want—that is, the petitioner should not speak with them. They simply told him that the public defender had called, and that he had a right to the public defender.

We accept that concession.[2]

By failing to focus on all of the facts, the dissent misinterprets our holding. *See* dissenting opinion at 1429, n. 3. We do not hold that the statement, "I don't want to do what [the public defender] said not to do" would be equivocal if the suspect knew that the public defender wanted him to stop talking. That is not this case. In this case, the suspect, Coleman, said: "*I don't know.* But if he said to stop it I don't want to do what he said not to do." (Emphasis added.) Coleman also indicated ("I guess if that guy thinks it's all right ...") that Coleman did *not* know the public defender wanted him to stop talking, and his attorney has conceded to this Court that the record does not show that he knew. Our holding is limited to the specific facts of this case, under which a reasonable officer could interpret the suspect's words to mean that, as he said, he did not know whether he wanted to stop talking.

We do not need a dictionary to define the phrase: "I don't know." However, since the use of such reference works is in vogue among courts these days, we will point out the dictionary definition of "equivocal." It is defined as: "Having different significations equally appropriate or plausible; capable of double interpretation; ambiguous," 5 *Oxford English Dictionary* 359 (2d ed., J.A. Simpson & E.S.C. Weiner, eds., 1989); and as: "Having two or more significations; capable of more than one interpretation; of doubtful meaning; ambiguous," *Webster's Third International Unabridged Dictionary* 769 (1986). Coleman's statement is capable of

---

**1.** We agree with the observation, dissenting opinion at 1427, n. 1, that Coleman did not even know that the public defender was female.

**2.** To support its belief that our acceptance of counsel's concession is misplaced, the dissent cites three decisions which hold only that statements and arguments of counsel *at trial* and *in support of their position* are not evidence. Of

course they are not. But this *concession* was made by an attorney to an appellate court. We agree with the position that this Court has taken on prior occasions that it is entirely appropriate for this Court to accept such factual concessions. *E.g., American Sav. & Loan Ass'n v. Pembroke Lakes Regional Center Assocs., Ltd.,* 908 F.2d 885, 889 (11th Cir.1990); *In re Grand Jury Investigation,* 842 F.2d 1223, 1225 & n. 2 (11th Cir.1987).

equally plausible, differing interpretations; it is ambiguous; hence, it is equivocal.

Because Coleman's statement was equivocal, his subsequent statements were admissible. It does not matter whether the detectives dropped all questions about the crime until Coleman clarified his intent, because in the wake of the Supreme Court's decision in *Davis*, there is no duty to clarify a suspect's intent after such a statement. The obligation to cease questioning a suspect arises only when the suspect unambiguously invokes the right to remain silent. That did not occur here.

### B. WHETHER COLEMAN EFFECTIVELY WAIVED HIS *MIRANDA* RIGHTS

■ Coleman also contends that, because of the conduct of the police, as well as his youth and mental difficulties, his waiver of his *Miranda* rights was not voluntary and intelligent, and was therefore not effective. Under *Miranda*, the admission of statements taken during a custodial interrogation conducted outside the presence of the suspect's attorney is conditioned on the government's ability to show "that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." 384 U.S. at 475, 86 S.Ct. at 1628.

> The inquiry has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986) (quoting *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979)) (citations omitted). Mental illness is one factor to be considered in determining whether a waiver was made knowingly, *Miller v. Dugger*, 838 F.2d 1530, 1539 (11th Cir.), *cert. denied*, 486 U.S. 1061, 108 S.Ct. 2832, 100 L.Ed.2d 933 (1988); a juvenile's age, experience, education, background, and intelligence are others, *Fare*, 442 U.S. at 725, 99 S.Ct. at 2572. We review *de novo* the district court's determination of the voluntariness of a defendant's confession. *Cannady v. Dugger*, 931 F.2d 752, 753–54 (11th Cir.1991).

■ The Supreme Court has held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause." *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986). There is no indication in the record that Coleman was coerced. The transcript of Coleman's interrogation shows the opposite: at no time was he threatened or intimidated, and his interrogators made it clear to him that he could end their discussion at any time. Coleman's confession was voluntary.

■ The next step in the analysis is to determine whether the confession was made knowingly and intelligently. The evidence establishes that Coleman was able to comprehend the *Miranda* warnings and the consequences of waiving those warnings. At the evidentiary hearing held on Coleman's motion to suppress his confession, the psychiatrist whom Coleman called to testify to his state of mind, Dr. Emanuel Tanay, testified that Coleman was "of superior intelligence" and would have understood the *Miranda* warnings. A psychiatrist called by the State also testified that Coleman had the mental capacity to understand the *Miranda* warnings. A clinical psychologist called by the State testified that he had determined that, intellectually, Coleman "functions within the superior range of ability"; he also testified that Coleman had the capacity to understand the *Miranda* warnings and to make a knowing and understanding waiver of those rights. There was no evidence to the contrary. The district court was therefore entirely justified

in determining that Coleman knowingly and intelligently waived his rights.[3]

## III. CONCLUSION

The order of the district court denying Coleman's habeas petition is AFFIRMED.

JOHNSON, Senior Circuit Judge, dissenting:

I respectfully dissent. In my opinion, the record demonstrates that Coleman unequivocally invoked his right to remain silent, pursuant to the Fifth and Fourteenth Amendments of the Constitution.

According to the majority, Coleman's statement that "he did not want to do what he [the public defender] said not to do"[1] was an equivocal indication of Coleman's desire to remain silent. The majority premises this conclusion on the declaration of Coleman's counsel at oral argument that, at the time Coleman made his statement, he had not been told that the public defender did not want him to answer questions. Instead, counsel stated that Coleman had been told only that a public defender had called. Relying on counsel's declaration, the majority reasons that Coleman's statement cannot be interpreted to mean "because the public defender says not to talk, I do not want to talk." Rather, it finds that Coleman's statement was equivocal because (1) he did not know that the public defender had told the detectives to stop questioning him, (2) he answered "I don't know" when asked by detective Valente if he wanted a public defender, and (3) a reasonable officer would not have interpreted Coleman's statement to be a request to cut off questioning. I disagree with all three predicates.

The majority's reliance on the declaration of Coleman's counsel is misplaced. Statements and arguments of counsel are not evidence. *United States v. Camejo*, 929 F.2d

610, 617 (11th Cir.), *cert. denied,* ── U.S. ──, 112 S.Ct. 228, 116 L.Ed.2d 185 (1991); *United States v. Smith,* 918 F.2d 1551, 1562 (11th Cir.1990); *United States v. Rojas,* 731 F.2d 707, 710 (11th Cir.1984). Moreover, the declaration of Coleman's counsel is completely disproved by the record. As noted, detective Rigney's and detective Valente's taped interrogation of Coleman was interrupted by a knock on the interrogation room door. [Suppression Hearing Transcript at 55]. After learning that the public defender was on the phone, and that she did not want the detectives speaking with Coleman, [*Id.* at 55], detective Valente stated on the tape:

> Okay, we just received a telephone call from the public defender's office that requested us to cease any further interview at this time. So at this time we'll be concluding this tape.

[Interrogation Transcript at 7]. Later, when the detectives asked Coleman if he wanted to speak with them, he answered, "Well, that one guy says I shouldn't." [Interrogation Transcript at 12]. As Coleman is referring to the public defender, the record indisputably demonstrates that Coleman was told that the public defender did not want him speaking to the police.

Furthermore, the declaration of Coleman's counsel is directly contradicted by both his and the government's briefs on appeal, as well as by the Magistrate Judge's Report and Recommendation adopted by the district court. For example, in his brief on appeal, Coleman's counsel states, "With the tape recorder still running, Valente tells the boy [Coleman] that his public defender has just called and demanded the detectives to stop asking further questions." Appellant's Br. at 6. In its brief, the government states, "These officers [detectives Rigney and Valente] explained to appellant [Coleman] that a public defender had called requesting that

3. Coleman also argues that the detectives' refusal to allow Pflaum to talk to Coleman violated his right to counsel under the Sixth Amendment. This argument is foreclosed by *Moran v. Burbine,* 475 U.S. 412, 431, 106 S.Ct. 1135, 1146, 89 L.Ed.2d 410 (1986) (holding that the right to counsel did not attach to murder suspect who had yet to be formally charged, even though he was being questioned in custody and counsel

retained by a family member was trying to contact him). *Accord Jones v. Dugger,* 928 F.2d 1020, 1026–27 (11th Cir.), *cert. denied,* ── U.S. ──, 112 S.Ct. 216, 116 L.Ed.2d 174 (1991).

1. Coleman mistakenly thought the public defender was male.

the officers not question him." Appellee's Br. at 4. Similarly, the Magistrate Judge, in her Report and Recommendation, stated, "The detectives told petitioner [Coleman] that they had received a telephone call asking that they not speak with him." Report and Recommendation at 7. Thus, contrary to the majority's assertions, the detectives told Coleman more than the simple fact that his public defender telephoned. As made clear by the record, the detectives also told Coleman that the public defender had asked them to stop interviewing him. In light of the above, I have no doubt that Coleman was aware of the public defender's desire that he not speak with the detectives.[2]

Given Coleman's awareness, I also have no doubt that his statement was unequivocal. The record reveals that shortly after notifying Coleman of the public defender's wishes, the detectives resumed the taped interrogation. The following exchange then occurred:

*Valente:* "And what you're saying, or what you're about to say you're going to do of your own free will; is that correct?"

*Coleman:* "Yes. Unless, what about that one guy, though?"

*Valente:* "What guy?"

*Coleman:* "The guy—"

*Rigney:* "Public defender."

*Coleman:* "Yeah."

*Valente:* "Okay."

*Rigney:* "I explained to him what the public defender was—"

*Valente:* "Okay. Tony, do you feel that you want to have a public defender?"

*Coleman: "I don't know. But if he said to stop it I don't want to do what he said not to do."*

[Interrogation Transcript at 9–10] (emphasis added).

The majority's second rationale for finding Coleman's statement equivocal is the fact that Coleman answered "I don't know" when asked if he wanted a public defender. While it is true that Coleman may not have known if he wanted a public defender, he showed no such uncertainty when immediately thereafter, he stated, "But if he said to stop it I don't want to do what he said not to do." In common usage, the word "but" qualifies and limits preceding language. For example, according to *Webster's,* the word "but" typically means "except" and "except that." *Webster's Third New International Dictionary Unabridged* 303 (1976). Additionally, *Webster's* notes that "however" may be defined as "in spite of that: on the other hand: but." *Id.* at 1097. Substituting any of these terms for "but," Coleman's response to the question of whether he wanted a public defender should be interpreted as "I don't know. [Except that] if [the public defender] said to stop it I don't want to do what he said not to do." Because Coleman knew the public defender had requested that the detectives cease questioning him, his statement must mean "because the public defender says you shouldn't talk to me, I don't want to talk to you." The fact that prior to making this statement he said "I don't know" is of no consequence. The "I don't know" was in answer to the question of whether he wanted a public defender and was clarified by the use of "but" in Coleman's very next phrase, such that Coleman was saying that while he did not know if he wanted a public defender, he

---

**2.** Based on Coleman's counsel's declaration that Coleman had been told only that the public defender called, the majority finds, in a footnote, that Coleman interpreted detective Valente's statement to mean that the public defender had called and asked only that the interrogation cease while she was on the phone. I cannot agree with the majority's interpretation.

As shown, counsel's declaration is wholly unsupported by the record and runs contrary to both his and the government's statement of facts in their briefs on appeal. Accordingly, unlike the majority, I place no credence in the declaration

of Coleman's counsel at oral argument. I also believe that a second critical flaw exists in the majority's reasoning. If Coleman interpreted the public defender's statement to be limited to the time she was on the phone, there would be no reason for him to bring up her statement once the phone call ended and interrogation resumed. That Coleman's response to the resumption of interrogation was that he did not "want to do what he [the public defender] said not to do" and "that one guy [the public defender] says I shouldn't" demonstrates that Coleman knew that

knew that he did not want to speak with the police.[3]

Finally, the majority claims that "a reasonable officer would not have interpreted Coleman's statement to be a request to cut off questioning." I believe this conclusion is untenable. The record shows that the detectives knew that the public defender did not want Coleman to speak with them. It further shows that the detectives told Coleman that the public defender's office had asked them to stop interviewing him. Under these circumstances, a "reasonable" officer hearing Coleman's statement could only believe that Coleman did not want to speak with them. In light of the above, I would reverse the district court's dismissal of Coleman's habeas petition.

the public defender wanted the interrogation to cease entirely.

**3.** Although it may have been preferable had Coleman's response to the question of whether he wanted a public defender been, "I don't know. But, I know I don't want to speak with you because the public defender doesn't want me to,"

Coleman need not speak like an Oxford don to invoke his constitutional rights. *Davis,* —— U.S. at ——, 114 S.Ct. at 2355. In fact, I believe that Coleman, a fifteen-year-old boy, cannot be expected to speak with the clarity of an average adult.