**UNITED STATES of America, Plaintiff,**

v.

**Gert Louis NUYENS, Defendant.**

**No. 98–95–CR–ORL–19C.**

United States District Court, M.D. Florida, Orlando Division.

July 27, 1998.

Stuart Ira Hyman, Nejame & Hyman, Orlando, FL, Kirk N. Kirkconnell, Kirkconnell,

Lindsey, Snure & Henson, P.A., Winter Park, FL, Gert Louis Nuyens, Lake Mary, FL, for Gert Louis Nuyens.

A. B. Phillips, U.S. Attorney's Office, Middle District of Florida, Orlando, FL, for U.S.A.

FAWSETT, District Judge.

## ORDER

This case was considered by the Court on the Report and Recommendation of the United States Magistrate Judge (Doc. No. 103, filed July 20, 1998). No objection to said Report and Recommendation was filed. Upon consideration, it is

ORDERED that the Report and Recommendation (Doc. No. 103) is **ADOPTED and AFFIRMED.** The Motion to Suppress Evidence Seized Under Search Warrant Executed October 16, 1997 (Doc. No. 56, filed May 27, 1998) is **GRANTED.** The Motion to Suppress Statements (Doc. No. 58, filed May 27, 1998) is **DENIED.**

## REPORT AND RECOMMENDATION

July 20, 1998.

GLAZEBROOK, United States Magistrate Judge.

This cause came on for an evidentiary hearing on July 14 and 15, 1998 on the following motions:

| | |
|---|---|
| **MOTION:** | **MOTION TO SUPPRESS EVIDENCE SEIZED UNDER SEARCH WARRANT EXECUTED OCTOBER 16, 1997** [Docket No. 56] |
| **FILED:** | May 27,1998 |
| **RECOMMENDATION:** | **GRANTED.** |
| **MOTION:** | **MOTION TO SUPPRESS STATEMENTS** [Docket No.58] |
| **FILED:** | MAY 27, 1998 |
| **RECOMMENDATION:** | **DENIED.** |

## I. INTRODUCTION

Defendant Gert Louis Nuyens seeks to suppress two pieces of evidence found by law enforcement officers during a search of his home on July 11, 1996. First, Nuyens seeks to suppress a note pad, alleged to be a drug ledger, found in his master bedroom inside an entertainment center. The Metropolitan Bureau of Investigation has misplaced the note pad, but hopes to find it before trial begins next week on July 27, 1998. Docket Nos. 56; GX2. Second, Nuyens seeks to suppress three photographs, allegedly depicting defendants engaged in uncharged drug activity. Law enforcement agents found the photographs in Nuyen's master bedroom on top of a desk. Docket Nos. 56; GX2. The government does not intend to introduce the photographs in its case-in-chief, but opposes suppression in case the photographs are admissible in cross examining a defendant.

In addition, Nuyens has moved to suppress all statements that he made to law enforcement officers during his custodial interrogation on July 11, 1996, Docket No. 58 at 1, and during the search of his residence, Docket No. 56 at 1. Nuyens claims that the law enforcement officers did not properly read him his *Miranda* rights, and that those *Miranda* rights that were read were deficient

under the law. Docket No. 58 at 1, ¶ 2.[1]

## II. THE LAW

### A. *The Search Warrant*

The parties agree that the following law governing consent searches applies in this case. A warrantless search of a person's home is presumptively unreasonable unless the search falls with a specifically established exception. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). One established exception is that a warrantless search may be made on consent. *Id.*

 Voluntariness of consent is a question of fact, and the Court must look to the totality of the circumstances. *See United States v. Tovar–Rico*, 61 F.3d 1529, 1535 (11th Cir.1995). Consent is voluntary if it is the product of a free and unrestrained choice. *Id.* Factors in assessing voluntariness include 1.) the individual's knowledge of his constitutional right to refuse to consent; 2.) his age, intelligence, education and language ability; 3.) the degree to which he cooperates with the police; 4.) his attitude about the likelihood of the discovery of contraband; 5.) the length of detention and the nature of the questioning, including the use of coercive police behavior. *Schneckloth*, 412 U.S. at 226–27, 93 S.Ct. 2041.

 The government has the burden of proving that the subject freely and voluntarily consented. *Schneckloth*, 412 U.S. at 248, 93 S.Ct. 2041. Where the validity of a search rests on consent, the government has the burden of proving that the police obtained the necessary consent, and that the defendant freely and voluntarily gave it, a burden that is not satisfied by showing a mere submission to a claim of lawful authority. *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *see also, Bumper v. State of North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968) (consent may be invalid if it is given only after the official conducting the search asserts that he possesses a warrant or can obtain one if necessary).

In *United States v. Tovar–Rico*, 61 F.3d 1529, 1535 (11th Cir.1995), five police officers announced their identity, entered with guns drawn to conduct a protective sweep, and then asked Tovar for permission to search the apartment. As she was calmly seated at the dining room table, the police officers told Tovar that she did not have to permit the further search, but that they would come back with a search warrant if she did not. Tovar agreed to the search, and signed a written consent form. 61 F.3d at 1536. The United States Court of Appeals for the Eleventh Circuit agreed with the district court that—after watching the officers explore every room of the apartment during the protective sweep—Tovar could not reasonably have known that she could still refuse to permit a search. 61 F.3d at 1535–36.

### B. *Miranda Warnings*

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend V. In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court crafted warnings to serve as a procedural safeguard of a defendant's Fifth Amendment rights during custodial interrogation. *New York v. Quarles*, 467 U.S. 649, 654, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). The police must convey *Miranda*'s essential message to a defendant before custodial interrogation.

 Before introducing a statement that is the product of custodial interrogation, the government must prove by a preponderance of the evidence that the defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights. *See Colorado v. Connelly,* 479 U.S. 157, 169–70, 107 S.Ct. 515, 93

---

1. The Honorable Patricia C. Fawsett referred the motions to suppress to the undersigned for evidentiary hearing. Kirk Kirkconnell withdrew as counsel for Nuyens on June 30, 1998, Docket No. 75, and Stuart Hyman appeared as substitute counsel on June 19, 1998. Docket No. 76.

L.Ed.2d 473 (1986); *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986); *Coleman v. Singletary,* 30 F.3d 1420, 1426 (11th Cir.1994). In assessing the totality of the circumstances surrounding a waiver, the district court may consider the defendant's age, intelligence, education, language ability, and mental condition; pressure from law enforcement officers; the explicitness of the waiver; and length of time between warning and questioning. *See* 85 GEORGETOWN L.J. 958–67 (April 1997). *Miranda* warnings are an important factor in delinking an illegal search from a later confession under the "fruit of the poisonous tree" doctrine, but may not always be sufficient standing alone. *See United States v. Miller,* 608 F.2d 1089, 1101 (5th Cir.1979).

## III. THE FACTS

On July 11, 1996, the Honorable Alice Blackwell White, Orange County Circuit Judge, issued an anticipatory warrant permitting law enforcement officers to search Gert Nuyens' residence at 1399 Ravida Woods Drive, Apopka.[2] GX2. Judge White authorized law enforcement officers to search for one specific item: a postal package from Holland addressed to Gert Nuyens containing 1480 tablets of MDMA or "Ecstasy" that a U.S. Postal Inspector would deliver to Nuyens later that day. GX2. The warrant required the law enforcement officers to make a "return and inventory" to the Court of the property "seized under this warrant." GX2.

On July 18, 1996, seven days after executing the search warrant, Agent Daniel Lloyd of the Metropolitan Bureau of Investigation swore out a return before a Deputy Court Clerk of the Circuit Court. GX2. Agent Lloyd stated under oath that he had executed the search warrant on July 11, 1996 "by searching the property described therein,"[3] and *"by having read and delivered a copy of the Search Warrant and Inventory and Receipt to 1399 Ravida Woods Dr (Gert*

*Nuyens)."* GX2 (emphasis supplied). Agent Lloyd also swore that the attached "Search Warrant Evidence Inventory/Return Log" contains a "true and detailed account of all of the property taken by me *on said Warrant."* GX2 (emphasis supplied). The "Search Warrant Evidence Inventory/Return Log" lists as property seized pursuant to the warrant not only the postal parcel containing the MDMA found inside the trunk of the Nissan Pulsar, but also the note pad and three photographs found in Nuyens' master bedroom. Evidently, Agent Lloyd believed on July 18, 1996— seven days after the search—that he had seized the items in Nuyens' bedroom *pursuant to the search warrant.*

At the evidentiary hearing on July 15 and 16, 1998—two years after the search—the government took a different position. The government acknowledged that the search warrant limited itself to a search for the postal package, GX2, and that the law enforcement officers had already found the package in the trunk of a Nissan Pulsar at the time they decided to search Nuyens' house. The government argued that agents under Agent Lloyd's direction had not seized the inventoried note pad and three photographs "on said warrant." GX2. Rather, the government argued that Agent Lloyd actually seized the evidence pursuant to Nuyens' free and voluntary consent to search his home after the police had fully executed the search warrant.

From the testimony at the hearing, the following facts appear. At the time of the hearing, defendant Gert Nuyens was a 28–year–old Belgian physical therapist who had lived in Florida since September 1995. Nuyens received his B.S. degree in "Muscle Rehabilitation and Physical Therapy" from the Free University of Brussels, graduating "with great distinction," and became licensed to practice in Belgium and in Florida. The United States admitted Nuyens on a visa for people who have unique technical skills or

**2.** The application (affidavit) for the search warrant describes in detail the facts leading up to the issuance of the warrant. GX2.

**3.** The warrant describes the property as 1399 Ravida Woods Drive and "any vehicles on the property." GX2.

education not possessed by United States citizens. Nuyens now supervises a staff of other physical, occupational, and speech therapists.

Nuyens testified at the hearing, and speaks and understands English very well. Although Nuyens' English may have been less perfect two years ago, a review of the audio portion of a video tape of Nuyens in a patrol car on the day of the search demonstrates that Nuyens understood questions put to him by an alleged co-conspirator, and communicated well in English.

On the afternoon of July 11, 1996, a postal inspector made a controlled delivery of the postal parcel to Gert Nuyens at 1399 Ravida Woods, Apopka. At 5:20 p.m., Marinelli's Nissan Pulsar pulled up to the house, and Marinelli and two other men entered Nuyens' house, and left a few minutes later. GX3 [video]. The men left Nuyens' house. One man carried a package, and placed it in the trunk of the Nissan Pulsar. The law enforcement officers could not determine whether it was the postal package containing the MDMA. At 5:35 p.m., five to seven law enforcement officers wearing smocks marked "POLICE" moved quickly to the front door with guns drawn. GX3. Five or more police cars pulled up. GX3. Simultaneously, other officers stopped the Nissan Pulsar as it pulled out, and detained the three men.

Agent Angelo Nieves knocked loudly on the front door with a flashlight and said "Sheriff's Office with a search warrant—open the door!" Agent Nieves stepped aside, and the door came open, probably by police action. Nuyens was just inside the door, and about to open it. The agents, including Case Agent Daniel Lloyd and Agent Angelo Nieves, entered with guns drawn. Agent Lloyd ordered Nuyens down on the floor, and an officer handcuffed him. The agents "swept" the house quickly looking in all rooms and closets for threats such as people and guns, but did not look for or find any evidence. The house was secure in two or three minutes, all guns were holstered, and Nuyens was removed to the couch. At first,

Nuyens was in "total shock" at the entry, but soon calmed down. When Nuyens was seated on the couch, the law enforcement officer who had cuffed Nuyens then read Nuyens the search warrant.

Agent Lloyd was not present. Agent Lloyd had left the house to go to the Nissan Pulsar. Within minutes of initially entering the house, an officer opened the trunk with a key and found the postal package. The police had not yet searched the house.

Agent Lloyd returned to the house, and asked Agent Nieves to question Nuyens, who was not free to leave. With seven to ten agents and officers in and around Nuyens' house, the atmosphere was dominated by police. About five or ten minutes after initial entry [i.e., at about 5:45 p.m.], Agent Nieves borrowed a *Miranda* rights card from a Federal agent, and read Nuyens his *Miranda* rights off the card. Agent Nieves asked Nuyens whether he understood the rights each time. Each time, Nuyens told Agent Nieves that he understood. Nuyens used good English. A short time later, Nuyens gave incriminating answers to Agent Nieves' questions about the postal package, the drugs, and his relationship with Marinelli. Nuyens was cooperative in that he answered most questions.

Agent Nieves had read *Miranda* rights to defendants several hundred times before. Agent Lloyd heard Agent Nieves read the rights, and heard Nuyens waive his rights. Approximately one hour later in the Apopka police cruiser, Nuyens acknowledged to Marinelli in a recorded conversation that he had been advised of his right to remain silent. GX3.

Nuyens was seated on the couch just after having been read his rights. Agent Nieves knew that the police had found the postal package. Within about ten minutes of initial entry, Agent Nieves asked Nuyens for permission to search his house and/or his vehicle, and told Nuyens "why the police were there." Agent Nieves told Nuyens that he had the right to refuse consent, but did not read the consent form to him. Nuyens point-

ed out the master bedroom to Agent Nieves and said that it was his, and said that the other two bedrooms belonged to his two roommates.

Agent Nieves' testimony and Nuyens' testimony diverge at this point. According to Agent Nieves, Nuyens said "those are my roommates' rooms, not mine, so I do not consent to search them." Nuyens then consented to a search of the rest of the house. Agent Nieves testified that he immediately filled out the blanks in the consent form, GX1, and gave the form to Nuyens to read. Agent Nieves said that he is certain that Nuyens then signed the form at that time, about ten minutes after initial entry of the house, and before the search began. By signing the consent form, Nuyens acknowledged that he had been "informed of my Constitutional right not to have a search made of the premises/vehicle and of my right to refuse to consent to such a search." GX1. Nuyens signed a consent form that recited that Nuyens gave permission to search "voluntarily." GX1. Agent Nieves testified that there was "no chance" that Nuyens signed the form *after* the search. Agent Marilyn Lucas signed the consent form as a witness,[4] as did Agent Nieves.

Nuyens acknowledged that Agent Nieves had asked for permission to search the house. Nuyens testified, however, that he had thought that he had no choice but to let the police search the house because they had a search warrant. Nuyens testified that Agent Nieves did not ask him to sign the consent to search form until several hours later, at about 10:30 p.m., after the search had already been completed, and after the police had removed his handcuffs to leave. Nuyens did not deny that he signed the consent to search form before the agents left, but testified that the agents told him that he had to sign it after the search "because they did the search warrant." [5]

Agent Lloyd did not hear the specifics of the conversation about consent. Agent Nieves told Agent Lloyd that he could go ahead and search the house, except for the two roommates' bedrooms. Agent Lloyd closed the doors to the two bedrooms "because they had not been consented to," and the agents began to search the master bedroom. Agent Lloyd did not know when Nuyens signed the consent to search form. GX1.

After questioning Nuyens for a few minutes, Agent Nieves left Nuyens. According to Nuyens, Immigration Agent Gonzalez then spoke loudly on a cellular telephone in the kitchen with Immigration agents at the office who allegedly told Agent Gonzalez that they had a case on Nuyens that could result in his deportation. Nuyens testified that Agent Gonzalez told him that if he were to cooperate, however, he might avoid going to jail and avoid deportation. Agent Lloyd and Agent Nieves heard no such conversation, but may not have been present.

At 6:43, an officer removed a defendant from an Apopka police cruiser, and placed Nuyens (handcuffed behind his back) in the back seat with Brian Marinelli. Nuyens stayed in the police car for about an hour and a half [i.e., until about 8:15 p.m.].[6] An officer then returned Nuyens to the couch in the living room where he stayed for about two hours until about 10:15 p.m. With Agent Gonzalez' approval, Agent Nieves removed Nuyens' handcuffs. A law enforcement officer left a white copy of the search warrant and a yellow copy of the inventory with Nuyens. GX2. Everyone left around 10:30 p.m., and Nuyens remained free at home.

The testimony of Agent Lloyd and Agent Nieves was credible, despite notable inconsistencies resulting from the passage of two years since the search. Recognizing defendant Nuyens' distinct personal interest in

---

4. The government declined to call Agent Marilyn Lucas as a witness.

5. Nuyens' recollection of when he signed the consent form corresponds heavily with his self-interest.

6. The government declined to introduce the audio tape of the conversation in the patrol car, or to introduce police reports better establishing the timing. The Court did listen to the audio portion of the video tape. GX3.

obtaining suppression, the Court nevertheless finds that the bulk of his testimony was credible, with exceptions such as his testimony about his poor ability to understand English, and the timing of the signing of the consent form.

## IV. ANALYSIS

■ Agent Nieves fully and properly advised Nuyens of his *Miranda* rights from a Federal waiver of rights card before custodial interrogation began. Nieves understood and voluntarily, knowingly, and intelligently waived his *Miranda* rights. At the time that Agent Nieves read Nuyens his rights, Nuyens was properly in police custody. Nuyens' motion to suppress all post-*Miranda* statements [Docket No. 58] should be DENIED.

In assessing the totality of the circumstances surrounding Nuyens' waiver, the Court has considered Nuyens' age (then 26), his very high intelligence, his B.S. degree in Physical Therapy with academic honors, and his excellent language ability in English given that Flemish is his native tongue. Nuyens' mental condition was initially agitated, but later calm and somewhat cooperative. The Court has considered the pressure from the law enforcement officers to cooperate, which was routine. The warnings and waiver were both explicit, and the questioning immediately followed the warning and waiver. The *Miranda* warnings were properly given, and Nuyens' incriminating statements are admissible.

■ Looking at the same totality of the circumstances, however, the Court cannot also say that Nuyens' consent to search his home was the product of a free and unrestrained choice. Regarding the consent to search, the government has shown a mere submission to a claim of lawful authority. As in *United States v. Tovar–Rico*, 61 F.3d 1529, 1535 (11th Cir.1995), five or more police officers announced their identity, entered with guns drawn to conduct a protective sweep, and then asked Nuyens for permission to search the residence. As Nuyens was seated on the couch, the police officers told him that

he did not have to permit the further search, but Nuyens knew that the police already had a search warrant for his home. An agent read and showed the search warrant to Nuyens, later leaving a copy. Nuyens agreed to the search, and signed the written consent form. After watching the officers explore every room of the house during the protective sweep, Nuyens could not reasonably have known that he could still refuse to permit a search.

Indeed, Agent Lloyd later told the Circuit Court that he had seized the evidence in the master bedroom pursuant to the search warrant. Agent Lloyd even left with Nuyens a copy of the "Search Warrant Evidence Inventory/Return Log" listing the note pad and three photographs. GX2. Although the government has proved that Nuyens consented to the search of his home, the government has not met its burden of proving that Nuyens did so freely and voluntarily. The motion to suppress the note pad and three photographs [Docket No. 56] therefore should be GRANTED.

It is thoroughly consistent to find both 1.) that Nuyens understood his right to remain silent and to have an attorney present during questioning, and 2.) that Nuyens did not understand that he could withhold his consent to search. Nuyens repeated his understanding of his right to remain silent to Marinelli in the patrol car. Despite this knowledge, Nuyens voluntarily spoke to the police. Nuyens was well-educated, and smart enough to understand his *Miranda* rights. It is quite another matter to find that Nuyens reasonably understood that he could have required the police to obtain yet another search warrant after Nuyens watched the police enter his home on the authority of a search warrant, after the police had read the search warrant to Nuyens, and after Nuyens had watched the police go through all of the rooms in his house.

■ Lastly, the Court rejects as meritless Nuyens' argument that his post-*Miranda* incriminating statements are somehow the "fruit of the poisonous tree." The in-

criminating statements do not flow from the invalid consent search. Rather, the *Miranda* warnings and waiver preceded the consent search, and bore no significant relationship to the consent search. The interrogation stands on its own, and in no way flows from the search. The police did not ask Nuyens questions about the note pad and photographs. There is no evidence of record that, but for the invalid consent search, the police would have refrained from interrogated Nuyens. There is no evidence of record that, but for the invalid consent search, Nuyens would have decided to remain silent or ask for counsel.

## V. CONCLUSION

Nuyens' motion to suppress all post-*Miranda* statements [Docket No. 58] should be DENIED. Nuyens' motion to suppress the note pad and three photographs [Docket No. 56] should be GRANTED.

Trial begins July 27, 1998. Accordingly, the parties have agreed to a shortened period of time to file objections to this report and recommendation. Failure to file written objections to the proposed findings and recommendations in this report pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 6.02 on or before 3:00 p.m. on Thursday, July 23, 1998, and to serve a copy by facsimile or hand delivery the same day, shall bar an aggrieved party from a *de novo* determination by the district court of issues covered in the report, and shall bar an aggrieved party from attacking the factual findings on appeal.