[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-15145

_____

D.C. Docket No. 0:09-cv-61652-ASG

MDS (CANADA) INC.,
a Canadian corporation,
BEST THERATRONICS, LTD.,
a Canadian corporation,
BEST MEDICAL INTERNATIONAL, INC.,
a.k.a. Beast Medical International, Inc.,

Plaintiffs - Counter Defendants - Appellants,

versus

RAD SOURCE TECHNOLOGIES, INC.,
a Florida corporation,

Defendant - Counter Claimant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(July 1, 2013)

Before DUBINA, Chief Judge, PRYOR and ANDERSON, Circuit Judges.

PER CURIAM:

This appeal presents a jurisdictional issue of first impression in our Court: whether the Federal Circuit has exclusive jurisdiction to hear an appeal of a breach of contract claim that would require the resolution of a claim of patent infringement for the complainant to succeed. We conclude that this Court does have appellate jurisdiction. We then address the merits of this breach of contract claim, discuss the district court's findings of facts and conclusions of law after the bench trial, and affirm in part and certify questions to the Florida Supreme Court.

## I. BACKGROUND

Rad Source Technologies is a Florida corporation with its principal place of business in Georgia. It specializes in research and development of irradiation technologies and participated in the development of the technology contained in the RS 3000 blood irradiation device. Blood is irradiated to eliminate pathogens and other microbes in blood to, among other things, reduce the risk of Graft Versus Host Disease (a common side effect in transplants). Rad Source's device replaced radioactive isotopes with X-rays as the means of irradiating the blood and was the first to do so. Rad Source developed its first product, the RS 3000, in the late 1990s, and received FDA approval in 1998. Rad Source manufactured and sold the RS 3000 in 1999 as a one blood bag device, but by 2001 had changed the

2

device to hold 2 or 3 bags.  Until August 2003, Rad Source sold the RS 3000 for $110,000 to $120,000.

Rad Source obtained three patents for its work in connection with the RS 3000.  These patents were U.S. Patent Nos. 6,212,255 (the '255 patent), 6,489,099 (the '099 patent), and 6,614,876 (the '876 patent).  These three patents are the patents to which the License Agreement between the parties refers.

Rad Source began work on a different type of technology in the late 1990s that would generate high doses of X-ray radiation through a long tube or cylindrical anode with an electron emitter centered through its entire length to generate a field of X-rays in three dimensions.  Rad Source obtained two patents related to this long tube technology, the '147 and the '686.

In the late 1990s, Rad Source approached MDS Nordion, now known as Nordion and referred to throughout this opinion as Nordion, about the RS 3000 but Nordion was not interested.  Nordion is a Canadian company with a specialty in the detection, prevention, and diagnosis of disease.  Nordion sold gamma-source blood irradiators and other irradiation products worldwide, but had no knowledge or focus on X-ray technology.

After 2002, when sales of the RS 3000 had increased, Nordion approached Rad Source about acquiring an interest in the RS 3000.  Because Rad Source did not have the funding to launch the RS 3000 internationally as it desired, it was

3

interested.  Further, Rad Source's resources were tied up in further development of X-ray technologies, including the long tube technology.  Because of Nordion's expertise in irradiation, Rad Source thought that a partnership would be a good fit. But Nordion stated that it was not yet interested in the long tube technology.

On August 20, 2003, Rad Source and Nordion entered the License Agreement that is the focus of this dispute.  The negotiation for the agreement had lasted over a year.  The Food and Drug Administration cleared Nordion to market and sell the RS 3000 in the United States on September 26, 2003, and that date served as the closing date for the License Agreement.  Nordion thereafter began marketing the RS 3000 as the "Raycell."

Rad Source received $1.7 million as compensation under the Agreement. The term of the license extended from the closing date until the last of the patents expired in 2022, and Rad Source agreed in effect to receive compensation only in the first four years of the Agreement, although Rad Source could receive compensation in the fifth year if Nordion sold more than forty systems that year.

In 2007, Rad Source employees saw Nordion employees at a conference and indicated that the long tube technology was ready to be revisited.  At the invitation of Rad Source, Nordion employee Carolin Vandenberg visited Rad Source's facilities outside of Atlanta with two other Nordion employees in July 2007.  The district court found that Rad Source showed the Nordion employees some devices

4

using the long tube technology in applications other than blood irradiation and spoke about whether the long tube technology had any application in blood irradiation. Rad Source heard from Nordion again in September when Rad Source's president, Randol Kirk, emailed Vandenberg about irradiation news and received a response from Vandenberg that seemed to suggest interest; she sought "a company profile, with some level of financials, if possible, that I can forward" and for his availability over the next few weeks. Rad Source provided the information in October, but never heard back from Nordion.

In November 2007, Nordion and Best Medical ("Best") executed an "Asset Purchase Agreement" for the sale of Nordion's External Beam Therapy and Self Contained Irradiator business for approximately $15 million. The closing of the agreement was conditioned on the execution of a non-compete clause by Nordion and the consent of about twenty-five companies to the assignment of their Nordion contracts to Best.

In December 2007, Nordion requested that Rad Source consent to an assignment of the License Agreement to Best. Rad Source was completely taken aback by the news of the agreement between Nordion and Best, in light of the recent visit by Vandenberg, and refused to consent. Rad Source stated that the assignment would not be in Rad Source's best economic or business interest, but

5

asked for the documents pertaining to the sale and said that it would reconsider the transaction. Nordion did not provide the information.

The parties participated in a conference call in January 2008 to discuss the request for consent to assignment. Nordion told Rad Source that it would sublicense its rights under the contract to Best if Rad Source did not consent. Rad Source protested that Nordion did not have that right and continued to oppose the assignment. Within the month, the owner of Best called the president of Rad Source, stating that he wanted to arrange a meeting and that he was closing the deal with Nordion that week. But Rad Source never heard back from the president and no meeting was arranged.

Nordion and Best entered the sublicense agreement on April 30, 2008. Nordion purported to grant Best all of the rights it had under the License Agreement, but the sublicense ended a day before Nordion's license ended. Best agreed to assume and perform all of Nordion's obligations and agreed that Best would indemnify Nordion in the event of a suit by Rad Source alleging a breach of the License Agreement. Further, the sublicense agreement provided that Nordion would not be required to make any payments to Rad Source until Nordion received payment from Best.

The asset purchase agreement between Nordion and Best closed in May 2008. Nordion executed a non-compete agreement, promising not to directly or

6

indirectly manufacture, develop, market or sell technology based on blood irradiators. At closing, 155 employees were transitioned to Best as was the Nordion building. The agreement lists as items sold the intellectual property from Rad Source and the Raycell line.

Rad Source employees heard about the closing shortly afterward via an article, a press release, and public filings. Rad Source did not at that point send a default notice to Nordion because it thought it would be futile and expensive as well as time-consuming. Rad Source finally sent a default notice and notice of termination in January 2011, well over a year after Nordion and Best filed suit.

In August 2008, Rad Source began developing a new blood irradiation device, the RS 3400, which used the long tube technology. In September of the same year, it submitted an application to the FDA, seeking approval to market the device. The FDA cleared Rad Source's application in February 2009, and in September 2009, Rad Source began to market the RS 3400 although it had not completed its design and development. Rad Source advertised the RS 3400 as a "direct medical upgrade of the Rad Source 3000 research and industrial irradiator." Rad Source told potential customers that it would be shipped by March 30, 2010, and submitted quotes to two potential customers.

Best and Nordion sent a cease and desist letter on September 30, 2009, that demanded Rad Source stop designing, marketing, and promoting the RS 3400.

7

Rad Source responded by letter that it thought Nordion was in breach of the Agreement under Article 12.  Nordion in turn responded that this notification was insufficient to constitute notice under Article 12.

Nordion and Best filed suit against Rad Source on October 15, 2009.  The district court granted Nordion's motion for a temporary restraining order on October 27, 2009.  Rad Source consolidated a separate matter it had filed that sought declaratory relief, and filed a counterclaim in this action.

During the course of the litigation, Nordion and Best discovered that Rad Source had failed to pay the maintenance fees on the '255 patent, and, as a result, the patent had expired.  In April 2010, Rad Source petitioned to have the patent reinstated, but the United States Patent and Trademark Office denied the petition. Nordion and Best amended their complaint to allege that Rad Source breached the License Agreement when it failed to maintain the patent.

In January 2011, Rad Source sent a termination notice to Nordion, stating that it thought the License Agreement was terminated.  It also sent cease and desist letters to Best, demanding that Best stop marketing and promoting the Raycell. Nordion and Best responded to the letter by stating that the termination was waived by Rad Source's knowledge of their activities for two years and corresponding failure to act.

8

The district court denied both of the parties' motions for partial summary judgment and conducted a ten-day bench trial in April 2011.  After the trial, the district court entered a preliminary order on April 20, 2011, and final judgment on September 30th, which denied recovery of damages for either of the parties and dismissed the case on the merits.  Specifically, the district court denied the claims of Nordion and Best against Rad Source for injunctive relief, breach of contract, unjust enrichment, and declaratory relief that the RS 3400 embodied the Patents.  It granted the request of Nordion and Best for declaratory relief that the License Agreement remains in full force, and granted Rad Source's declaratory relief that the RS 3400 does not embody the Patents.  Rad Source sought attorney's fees, but the district court stayed the motion pending this appeal.  Nordion and Best (hereinafter referred to collectively as "Appellants") appeal, raising several merits issues (discussed below in subparts A through F under the heading of "Merits").  Because we must always examine our own jurisdiction, we ordered supplementary briefing on a jurisdictional issue.  We first examine jurisdiction, and then turn to the merits.

## II.  JURISDICTION

Whether the Eleventh Circuit has jurisdiction over this appeal involving federal patent law is a question of law that we consider in the first instance.  See Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 807, 108 S. Ct. 2166,

9

2173 (1988). Rad Source argued in its brief that jurisdiction over this appeal lies exclusively in the Federal Circuit because at least one of the claims requires the district court to answer a question of patent infringement. A federal court must always satisfy itself of its own jurisdiction. Univ. of S. Ala. v. Am. Tobacco Co., 168 F.3d 405, 410 (11th Cir. 1999) (internal quotation marks and alteration omitted). Because this action was filed before Congress passed the America Invents Act of 2011, it is governed by a statute that granted the Federal Circuit exclusive jurisdiction "of an appeal from a final decision of a district court of the United States . . . if the jurisdiction of that court was based, in whole or in part, on section 1338." See Leahy-Smith America Invents Act of 2011, Pub. L. No. 112029, 125 Stat. 284, § 19 (amending 28 U.S.C. § 1295 (2006) and providing that those amendments will be effective for actions filed after the passage of the Act). Section 1338 grants federal district courts original jurisdiction "of any civil action arising under any Act of Congress relating to patents." 28 U.S.C. § 1338. Because we conclude that the district court had diversity jurisdiction, id. § 1332, and supplemental jurisdiction, id. § 1367, but not patent jurisdiction, we have jurisdiction over this appeal, id. § 1291.

The Supreme Court has explained that section 1338 must be interpreted in tandem with the statute that grants federal question jurisdiction, id. § 1331, because both statutes use the term "arising under," Christianson, 486 U.S. at 808–09, 108 S.

10

Ct. at 2173–74.  "Linguistic consistency, to which [courts] have historically adhered, demands that § 1338(a) jurisdiction . . . extend only to those cases in which a well-pleaded complaint establishes either that federal patent law creates the cause of action," id., 108 S. Ct. at 2174, or that "a state-law claim necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities," Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 314, 125 S. Ct. 2363, 2368 (2005).  "[A] claim supported by alternative theories in the complaint may not form the basis for § 1338(a) jurisdiction unless patent law is essential to each of those theories." Christianson, 486 U.S. at 810, 108 S. Ct. at 2174.

The complaint by Nordion for breach of contract regarding the design and promotion of the RS 3400 necessarily raises a federal issue that is actually disputed.  Nordion argues that the design and promotion of the RS 3400 violated Article 3.1 of its License Agreement, which prevented Rad Source from developing and promoting technology that "embodies, in whole or in part, the Patents."  To succeed on this claim, Nordion must prove that the RS 3400 infringes the licensed patents.  Although state law creates the cause of action for breach of contract, the related question of patent infringement is federal in nature.  And the

11

parties dispute whether the RS 3400 infringes the licensed patents. But the question of patent infringement here is not substantial.

"The substantiality inquiry under Grable looks [] to the importance of the issue to the federal system as a whole," Gunn v. Minton, __ U.S. __, __, 133 S. Ct. 1059, 1066 (2013), and the Supreme Court has identified three factors to assist in this inquiry. First, a pure question of law is more likely to be a substantial federal question. Empire Healthchoice Assur., Inc. v. McVeigh, 547 U.S. 677, 700–01, 126 S. Ct. 2121, 2137 (2006). Second, a question that will control many other cases is more likely to be a substantial federal question. Id. Third, a question that the government has a strong interest in litigating in a federal forum is more likely to be a substantial federal question. Grable, 545 U.S. at 315–16, 125 S. Ct. at 2368–69. All of these factors establish that the issue of patent infringement here is not a substantial federal question for the purpose of section 1338.

Although patent infringement is a mixed question of fact and law, the question in this appeal is heavily "fact-bound and situation-specific." See Empire Healthchoice, 547 U.S. at 700–701, 126 S. Ct. at 2137. When deciding a question of patent infringement, a court first construes the claims, and then determines "whether the claims, as properly construed, read on the accused device." WMS Gaming, Inc. v. Int'l Game Tech., 184 F.3d 1339, 1346 (Fed. Cir. 1999). Although the first step of construction involves questions of law, the second step involves

questions of fact.  Id.  And "[w]hat the Court said about Grable in Empire Healthchoice can be said here too.  We have a fact-specific application of rules that come from both federal and state law rather than a context-free inquiry into the meaning of a federal law."  Byrne v. Wood, Herron & Evans LLP, 676 F.3d 1024, 1034–35 (Fed. Cir. 2012) (O'Malley, J., dissenting from the denial of a petition for rehearing en banc) (quoting Bennett v. Sw. Airlines, Co., 484 F.3d 907, 910 (7th Cir. 2007)).

Because this question of patent infringement is heavily fact-bound, our resolution of this question is unlikely to control any future cases.  All of the relevant parties are joined in this lawsuit and will be bound by the decision regarding the RS 3400.  Both the highly specialized nature of patent claims and the niche market for blood irradiator devices suggest that the resolution of this issue is unlikely to impact any future constructions of claims.  "The present case is 'poles apart from Grable,' in which a state court's resolution of the federal question 'would be controlling in numerous other cases.'"  Gunn, __ U.S. at __, 133 S. Ct. at 1067 (quoting Empire Healthchoice, 547 U.S. at 700, 126 S. Ct. at 2126).

The government interest in having any single case of patent infringement heard in a federal forum is limited.  In Grable, the Supreme Court explained that "[t]he Government has a strong interest in the prompt and certain collection of delinquent taxes, and the ability of the IRS to satisfy its claims from the property

13

of delinquents requires clear terms of notice." 545 U.S. at 315, 125 S. Ct. at 2368. But the government interest in any particular fact-bound question of patent infringement is less significant than the government interest in a question of law that will impact the ability of the government to raise revenue in a number of future cases. Empire Healthchoice, 547 U.S. at 701, 126 S. Ct. at 2137. This appeal does not require us "to determine whether an action of a federal agency complied with a federal statute." Byrne, 676 F.3d at 1035 (O'Malley, J., dissenting from the denial of a petition for rehearing en banc). Nor will it be dispositive of any future actions by the Patent and Trademark Office to grant or deny a patent. Although the Supreme Court has recognized that the government has expressed an interest in "reduc[ing] the widespread lack of uniformity and uncertainty of legal doctrine that exist[ed] in the administration of patent law," Christianson, 486 U.S. at 813, 108 S. Ct. at 2176, Congress limited the patent jurisdiction of the federal courts to actions arising under the patent laws, see 28 U.S.C. § 1338. As the Supreme Court has explained, "There is no doubt that resolution of a patent issue in the context of a state legal malpractice action can be vitally important to the particular parties in that case[,] [b]ut something more, demonstrating that the question is significant to the federal system as a whole, is needed." Gunn, __ U.S. __, 133 S. Ct. at 1068. In the light of the fact-bound nature of the question, the small likelihood that the resolution of the issue would impact future cases, and the

14

weak interest of the government in federal adjudication of this action, we cannot conclude that the issue of patent infringement presented by Nordion is a "substantial question" of federal law.

If we were to conclude that this case about a breach of contract arises under the patent laws, we also would upset the "congressionally approved balance of federal and state judicial responsibilities." See Grable, 545 U.S. at 314, 125 S. Ct. at 2368. To hold that all questions of patent infringement are substantial questions of federal law for the purposes of federal patent jurisdiction would sweep a number of state-law claims into federal court. See, e.g., Minton v. Gunn, 355 S.W.3d 634 (Tex. 2011), rev'd, Gunn, __ U.S. __, 133 S. Ct. 1059 (2013); Landmark Screens, LLC v. Morgan, Lewis & Bockius, LLP, 107 Cal. Rptr. 3d 373 (Cal. Ct. App. 2010); Premier Networks, Inc. v. Stadheim & Grear, Ltd., 395 Ill. App. 3d 629 (Ill. Ct. App. 2009). And the Supreme Court has counseled us to avoid decisions that alter the "federal-state division of labor." Grable, 545 U.S. at 315, 125 S. Ct. at 2368. Specifically, the Supreme Court has explained that state law claims "based on underlying patent matters will rarely, if ever, arise under federal patent law for purposes of § 1338(a)." See Gunn, __ U.S. at __, 133 S. Ct. at 1065.

The district court did not have jurisdiction in whole or in part based on section 1338, and the Federal Circuit does not have exclusive jurisdiction over this

appeal.  We have jurisdiction to hear this appeal where the district court had diversity and supplemental jurisdiction.

### III.  MERITS

Having concluded that we do have appellate jurisdiction, we now address the merits, and examine in turn each of the several merits issues that Appellants raise on appeal.

### A.    Is Article 3.1 Ambiguous?

Appellants argue that the district court erred when it held that Article 3.1 was ambiguous.  Article 3.1 provides as follows:

> [1] As of the Closing Date, Rad Source hereby grants to Nordion, and Nordion accepts, for the term of the license as set out in Section 12.1, subject to the second sentence of this Section 3.1, an exclusive right and license (transferable, with the right to grant sublicenses to third parties ("Sublicensees") on such terms as are consistent with this Agreement to Use the Licensed Technology for the System (including as modified by Nordion) and for the single power supply version of the System, in the Territory. [2] The foregoing grant of exclusivity is made subject to Rad Source's retention of the right to use the Licensed Technology to develop, manufacture or have manufactured, distribute, promote, market, sell, lease and service products other than the System and single power supply version of the System in the Territory. [3] For the avoidance of doubt, Rad Source's retained right to use the Licensed Technology (as set out in the preceding sentence) shall not, during the term of the license, in the Territory, include the right, directly or indirectly, to develop, manufacture or to have manufactured, distribute, promote, market, sell or lease a medical device for blood or blood product irradiation, which is used or useable to reduce the risk of Graft Versus Host Disease or other blood borne pathogen, and which embodies, in whole or in part, the Patents.

16

License Agreement, Article 3.1 (brackets numbering the three sentences added). The district court held that there was both a latent ambiguity and an intermediate ambiguity. The district court held that, under the governing Florida law, the extrinsic evidence – i.e., the overwhelming evidence that the parties contemplated that the long tube technology then being developed by Rad Source was not covered by the License Agreement, but was reserved for future negotiation in a later license agreement – raised a latent ambiguity as to the meaning of the phrase "embodies in whole or in part the Patents" and required the consideration of parol evidence.[1] Thus the district court considered extrinsic evidence of the parties' intent, and found overwhelming evidence that the parties intended to convey to Nordion the right to use the patents only with respect to the RS 3000, not the long tube technology. Accordingly, the district court held that Nordion had no interests in, or rights with respect to, the RS 3400.

On appeal, Appellants argue that the last sentence of Article 3.1 is not ambiguous, and thus that the district court erred in permitting the introduction of extrinsic evidence. We review the question of whether there was an ambiguity in the contract de novo. Am. Sav. & Loan Assoc. of Fla. v. Pembroke Lakes Reg. Ctr. Assoc., 908 F.2d 885, 888 (11th Cir. 1990). A patent ambiguity arises from

---

[1]    The district court read Florida law as providing for a third category of ambiguity (in addition to patent and latent), namely intermediate ambiguity – i.e., including both patent and latent aspects. See Ace Elec. Supply Co. v. Terra Nova Elec., Inc., 288 So. 2d 544, 547 (Fla. Dist. Ct. App. 1973).

17

defective, obscure, or insensible language, and Florida law does not permit the introduction of extrinsic evidence to discern the parties' intentions.  Ace Elec. Supply Co. v. Terra Nova Elec., Inc., 288 So. 2d 544, 547 (Fla. Dist. Ct. App. 1973).  "A latent ambiguity is said to exist where a contract fails to specify the rights or duties of the parties in certain situations and extrinsic evidence is necessary for interpretation or a choice between two possible meanings."  Forest Hills Util., Inc. v. Pasco Cnty., 536 So. 2d 1117, 1119 (Fla. Dist. Ct. App. 1988). Florida courts have recognized "intermediate ambiguity," when both latent and patent ambiguity exists; extrinsic evidence is permitted to clarify the parties' intentions.  Id.

    We conclude that Article 3.1 is unambiguous.  The first sentence in Article 3.1 constitutes the grant to Nordion of certain exclusive rights:

> As of the Closing Date, Rad Source hereby grants to Nordion . . . an exclusive right and license . . . to use the Licensed Technology for the System . . . and for the single power supply version of the System, in the Territory.

The term "Licensed Technology" is defined in Article 1.6 to mean "the Patent(s) and Technology Information as set out in Schedule A."  In turn, Schedule A identifies the three patents necessary to manufacture, install, service and maintain the current system design.  The System is defined in Article 1.9 to mean the RS 3000 System, including modifications thereto exploited or marketed by Rad Source as of the closing date.  The plain reading of the first sentence is that it grants

18

Nordion the exclusive right to use the patents to manufacture, install, service, and maintain the RS 3000 System. The second sentence of Article 3.1 provides that Rad Source retains "the right to use the Licensed Technology to develop, manufacture or have manufactured, distribute, promote, market, sell, lease and service products other than the System and single power supply version of the System, in the Territory." The third sentence imposes a restrictive covenant on Rad Source's use of the patents to develop a competing device:

> For the avoidance of doubt, Rad Source's retained right to use the Licensed Technology (as set out in the preceding sentence) shall not, during the term of the license, in the Territory, include the right, directly or indirectly, to develop, manufacture or to have manufactured, distribute, promote, market, sell or lease a medical device for blood or blood product irradiation, which is used or useable to reduce the risk of Graft Versus Host Disease or other blood borne pathogen, and which embodies, in whole or in part, the Patents.

Together these provisions grant Nordion the exclusive right to use the patents for the System; preserve the rights of Rad Source to exploit the patents for other products than the System, including, for example, research irradiators and medical devices that perform different functions; and prohibit Rad Source from infringing the patented technology to create a directly competing medical device.

Contrary to the assertion of the district court, the phrase "embodies, in whole or in part, the Patents" is not ambiguous. The district court determined that the phrase was latently ambiguous as to whether it encompasses the RS 3400 in addition to the RS 3000, but that question can be resolved by applying the plain

19

language of the text.  If the RS 3400 embodies the patents, then Rad Source is restricted from developing, manufacturing, distributing, promoting, marketing, selling, or leasing it during the term of the Agreement.  An embodiment is a "tangible manifestation of an invention."  Black's Law Dictionary 599 (9th ed. 2009).  Although extrinsic evidence shows that the parties treated the long tube technology as a separate matter from the X-ray technology licensed to Nordion, that evidence suggests that the RS 3400 is unlikely to be an infringement of the patent, not that the parties would have permitted the long tube technology to be used in an infringing medical device.

We also disagree with the conclusion of the district court that the third sentence is an unenforceable restrictive covenant under Florida law.  Under Florida law, the "enforcement of contracts that restrict or prohibit competition during or after the term of restrictive covenants, so long as such contracts are reasonable in time, area, and line of business, is not prohibited."  Fla. Stat. § 542.335(a).  Although a nineteen year restrictive covenant would likely be presumptively unreasonable under Florida law, the restrictive covenant is narrow in scope because it applies only to competition that infringes the licensed patents.  The restrictive covenant does not prevent Rad Source from developing a directly competing medical device based on new or different technology.  Nor does the restrictive covenant prevent Rad Source from using the patents for non-competing

20

purposes. To hold such a narrow restrictive covenant unenforceable would impose significant barriers for the execution of patent license agreements under Florida law.

B.    Does the RS 3400 Embody Claim 6 of the '255 Patent?

Because the text of Article 3.1 is unambiguous, we must consider whether the RS 3400 embodies, in whole or in part, the patents. The parties disagree about that issue. To resolve the issue, we must consider whether the RS 3400 infringes Claim 6 of the '255 patent.

We conduct a two-step analysis to answer this question. First, we review de novo the construction of the claim at issue. See WMS Gaming, Inc. v. Int'l Game Tech., 184 F.3d 1339, 1346 (Fed. Cir. 1999). Second, we review for clear error the finding of the district court as to whether the claims, as properly construed, read on the accused device. See id.

"The words of a claim are generally given their ordinary and customary meaning." Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotation marks omitted). "The ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." Id. at 1312–13. "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases

21

involves little more than the application of widely accepted meaning of commonly understood words." Id. at 1314.  Both the context in which the term is used and the use of that term in other claims are relevant to claim construction.  Id.  A claim should also be read in the light of the specification of which it is a part, but "it is improper to read a limitation from a specification into a claim."  Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 904 (Fed. Cir. 2004).

A product can infringe a patent because it is the literal equivalent of the claim or because it falls within the doctrine of equivalents.  See Markman, 517 U.S. at 384, 116 S. Ct. at 1393; Graver Tank & Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 605, 607, 70 S. Ct. 854, 855–56 (1950).  "The theory on which [the doctrine of equivalents] is founded is that if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form or shape."  Graver Tank, 339 U.S. at 608, 70 S. Ct. at 856 (internal quotation marks omitted).  "Each element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole."  Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 29, 117 S. Ct. 1040, 1049 (1997).

Nordion argues that the RS 3400 embodies Claim 6 of the '255 patent and, as a result, violates Article 3.1 of the License Agreement. Claim 6 of the '255 patent applies to a single-bag, X-ray irradiator:

> An X-ray irradiator for providing a uniform dose of X-ray beam irradiation to a transfusion blood bag, said bag being in the form of a rectangular box-like container, said irradiator comprising in combination,
> 1. source of X-ray radiation providing a beam of X-ray to cover a defined vertical area; and,
> 2. means for positioning said bag with its thickness dimension perpendicular to said beam to permit said beam to irradiate a first surface of said bag;
> 3. a support for said bag; and
> 4. means for rotating said support to cause said beam to irradiate the surface of said bag opposite said first surface.

The district court construed five terms in this claim: (1) beam, (2) source of X-ray radiation, (3) thickness dimension, (4) rotating, and (5) vertical area. We agree with that delineation of terms and review the construction of each of these terms in turn.

The first two terms—"beam" and "source of X-ray radiation"—are related to each other, and the district court correctly construed them. Claim 6 refers to a "source of X-ray radiation providing a beam of X-ray to cover a defined vertical area." The district court interpreted the word "beam" to include a cone of irradiation, but not a field of irradiation. And the district court interpreted the term "source of X-ray radiation" to mean a directional source, instead of a nondirectional source. Using the analogy relied on by the experts at trial, the

23

district court determined that the beam of X-ray mentioned in Claim 6 is more like the cone-shaped beam of light from a flashlight than the field of light emitted by a fluorescent tube light. Nordion's expert, Stephen Szeglin, testified that the terms in Claim 6 could encompass both a cone and a field of irradiation because X-ray beams are produced omni-directionally. Dr. Roberto Uribe, the expert who appeared on behalf of Rad Source, testified that a "beam" of X-ray would refer to radiation traveling in a well-defined direction. The Oxford English Dictionary defines a "beam" as both a "[a] ray, or 'bundle' of parallel rays, of light emitted from the sun or other luminous body; out-streaming radiance" and as "[a] directed flow of radiation or particles." *Beam*, Oxford English Dictionary Online, http://www.oed.com/view/Entry/16505. Although these definitions provide support for both experts' testimony, the context of Claim 6 supports the conclusion of the district court. The patent repeatedly references "beam" in contexts suggesting a directional, cone-like shape. For example, the description of the invention explains that "the output port of each of the X-ray tubes . . . should preferably have a diameter to provide a 45 degree beam such that the beam has at least a diameter of 15.5 cm at 23 cm distant from the tube." And Figure 4, which is a sketch of an embodiment of the single-source system, indicates a cone-like beam of X-rays. For these reasons, we construe the word "beam" in Claim 6 to reference a directed flow of particles in a cone-like shape.

24

We also accept the construction of the word "rotating" adopted by the district court. The district court construed the word "rotating" to be limited to turning the box to the opposite side, as opposed to a continuous circular rotation. This meaning is consistent with the context: Claim 6 requires a "means for rotating said support to cause said beam to irradiate the surface of said bag opposite said first surface." To rotate a bag to an opposite side, the rotation necessary would be 180 degrees, as opposed to a continuous 360-degree rotation.

And we agree with the district court that the term "vertical area" means that the bag must be oriented vertically, as opposed to horizontally. This inclusion of the word "vertical" in the phrase "defined vertical area" must have some meaning or it would be surplusage. Vertical is defined as "perpendicular to the plane of the horizon or to a primary axis." Merriam-Webster's Collegiate Dictionary 1391 (11th ed. 2009). Because the term vertical can only be understood in contrast with the horizontal axis, the district court correctly concluded that the bag in Claim 6 must be positioned vertically.

But we disagree with the district court that the term "thickness dimension" in Claim 6 is limited to a dimension of four centimeters or less. Although the description of the invention states that "the thickness of the bags is a [sic] maintained at 4 cm by the cannister," Claim 4 specifically describes an "irradiator . . . wherein the cannister maintains the maximum thickness of said bag

25

at 4 cm." Because Claim 4 defines the thickness of a bag to be 4 cm and Claim 6 does not, we cannot construe the term "thickness" in Claim 6 to be limited to 4 cm. Instead, the context of the term suggests only that the "thickness dimension" is the narrower side of the rectangular bag, as opposed to the broad surface that receives the beam directly.

Adopting these constructions, we conclude that the district court did not clearly err when it determined that the RS 3400 does not literally infringe the patent. The RS 3400 uses a continuously rotating cylindrical container to hold the blood bag, so the process of irradiation does not occur in two steps, with a 180-degree rotation in between. And the blood bag in the RS 3400 is oriented horizontally from the X-ray source. Thus the RS 3400 cannot fall within the literal terms of the claim.

We also conclude that the district court did not clearly err when it held that the RS 3400 was not substantially equivalent to Claim 6. Under the doctrine of equivalents, we examine each element of the claim to determine whether the allegedly infringing device meets that requirement or has some alternative feature that is equivalent to the unmet requirement. Warner-Jenkinson, 520 U.S. at 29, 117 S. Ct. at 1049. One way to evaluate substantial equivalence is to consider whether the element performs substantially the same function in substantially the same way to produce substantially the same result. See id. at 39–40, 117 S. Ct. at

26

1054. Most of the elements of Claim 6 are literally contained in the RS 3400. Like the blood irradiator described in Claim 6, the RS 3400 irradiates blood and provides a uniform dose of X-ray beam. But the irradiator described in Claim 6 holds the blood bag at a fixed distance from the X-ray source, and the blood bag is irradiated from one side, then turned and irradiated from the opposite side. By contrast, the blood bag in the RS 3400 is continuously rotated around the X-ray source in an elliptical pattern, like the orbit of a planet around the Sun. The district court was entitled to find that the means of irradiating and rotating the bag in the RS 3400 were not performed in substantially the same way as the embodiment described in Claim 6. Because the RS 3400 does not embody in whole or in part the licensed patents, Rad Source did not breach Article 3.1.[2]

---

[2] Nordion also argues that the district court abused its discretion when it excluded the testimony of one of its proffered experts, but we disagree. The district court excluded the testimony of Dr. Jon Roberts because he was essentially a patent attorney, not a person "having ordinary skill in the art" who could help the district court evaluate the claim of patent infringement. "The deference that is the hallmark of abuse-of-discretion review requires that we not reverse an evidentiary decision of a district court unless the ruling is manifestly erroneous. Thus, it is by now axiomatic that a district court enjoys considerable leeway in making these determinations." United States v. Frazier, 387 F.3d 1244, 1258 (11th Cir. 2004) (internal quotation marks and citation omitted). In admitting expert testimony, trial courts must consider whether:

> (1) the expert is qualified to testify competently regarding he matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

Id. at 1260. Dr. Roberts testified to his scientific background, which included a PhD and some scientific work in the field of electromechanical systems, but he admitted on cross examination that he was "not a person of ordinary skill relating to the physics of X-rays or the physics or things like that associated with the blood irradiation" and the bulk of his testimony concerned

C.    Did Rad Source Materially Breach the Contract When It Failed to Maintain the Patent?

The district court found that, although Rad Source breached the Agreement by failing to pay the maintenance fees on the '255 patent, it was not a material breach because (1) Appellants did not show that they suffered any harm, (2) the Agreement required them to monitor and remedy the payment of the patent maintenance fees if Rad Source should fail to pay them, and (3) the '876 patent (use of which was also granted in the License Agreement) adequately and substantially covered the necessary technology at issue.  Appellants challenge all three grounds on which the district court based its decision.

We conclude that the first ground provides sufficient support for the district court's ruling, so we need not address the other two grounds.  We agree with the district court that Rad Source breached its contractual obligation to pay the maintenance fees with respect to patent '255, but the district court was entitled to find that the breach was not material.  We review that finding for clear error. Ramos v. Nw. Mut. Ins. Co., 336 So. 2d 71, 75 (Fla. 1976) (addressing the standard of review for when a material breach occurs in a failure to cooperate insurance case and stating it is for clear error unless the facts are admitted).

legal issues of patent analysis.  The district court did not abuse its discretion when it excluded his testimony as unlikely to assist its understanding of the facts at issue.  We reject summarily the argument of Nordion that the district court abused its discretion when it did not specifically refer to the testimony of one of the experts in its findings of fact.

The district court did not clearly err in its finding of no material breach. To constitute a vital or material breach, a party's nonperformance must "go to the essence of the contract." Beefy Trail, Inc. v. Beefy King Int'l, Inc., 267 So. 2d 853, 857 (Fla. Dist. Ct. App. 1972). A party's "failure to perform some minor part of his contractual duty cannot be classified as a material or vital breach." Id. Appellants have not explained their own witness's testimony that he was unaware of any competitor that in the recent past had introduced a one-bag irradiator (the subject of the '255 patent). Nor do they contest Rad Source's evidence that it was unaware of any entity using the '255 patent. And Appellants have not explained why, if the maintenance of the patent was so important to Nordion, Nordion did not follow up with Rad Source when Rad Source failed to send notices about the payment of fees, as required by the License Agreement. All of this testimony supports the finding that Appellants suffered no harm to their business from this breach and that it did not go to the essence of the contract.

D.    Did Rad Source Unreasonably Refuse to Consent to the Assignment?

Appellants argue that the district court erred when it found that Rad Source's refusal to assent to the assignment was not unreasonable. Article 13.9 of the License Agreement prohibited assignment of the license without express written consent of the other party, but also provided that consent should not be

29

unreasonably withheld.  Again, we are addressing a purely factual issue governed by Florida law.

We cannot conclude that the district court clearly erred when it held that Rad Source's failure to consent was not unreasonable.  The district court considered the fact that Rad Source believed it had entered into a long-term relationship with Nordion, and had confidence in Nordion's interest in, and ability to market, the product and technology Rad Source had developed.  The district court also relied on the fact that Rad Source did not have the same confidence in Best and that Nordion refused to provide information about Best and about Nordion's transaction with Best.  Appellants have not countered these rationales; we cannot say that the finding by the district court was clearly erroneous.

> E.    Did the District Court Misapply the Doctrines of First Breach and Waiver Thereof; and Did the District Court Err with Respect to Its Rulings on Damages?

Because the factual situation is complex, we first describe the relevant district court rulings.  The district court ruled that Nordion committed the first material breach of the License Agreement when it transferred all of its rights to Best, which was tantamount to an assignment of the entirety of Nordion's interests in its License Agreement with Rad Source.  The district court held this was a material breach of the License Agreement because Nordion assigned its interests

30

without obtaining the required consent of Rad Source.  The district court held this was the first material breach because Rad Source's failure to maintain the '255 patent resulted in no harm and was not a material breach.

Although the district court had concluded that Nordion committed the first material breach of the License Agreement, the district court also found that Rad Source was not entitled to damages.  The district court found that Rad Source was at all times aware of the sublicense to Best and was also fully aware that Best was manufacturing and selling the RS 3000 System under the name of Raycell.  Despite that knowledge, the district court found that Rad Source unreasonably delayed sending a default notice and notice of termination until January 2011, well over a year after Nordion and Best filed suit.  Therefore, the district court held that Rad Source had waived and was estopped from recovering damages on the basis of Nordion's breaches.[3]

The district court also ruled that Rad Source subsequently breached Article 5.3(a) of the License Agreement, which prevented Rad Source from competing with Nordion for seven years.  The district court found that Rad Source's development and marketing of the RS 3400 device before September 26, 2010, (when the seven-year non-compete expired) did constitute a breach.  However, the district court also found that Rad Source's breach was excused because of

_____

[3]    For the same reasons, the district court also said that Nordion's first material breaches did not excuse Rad Source from future performance under the License Agreement.

Nordion's previous, first material breach thereof, thus freeing Rad Source to market the RS 3400. Thus, the district court held that Nordion was not entitled to damages on account of Rad Source's breach of the non-compete clause.

On appeal, Appellants challenge the district court's rulings in two respects. First, Appellants argue that the district court erroneously concluded that Nordion's transfer of all of its rights to Best constituted an assignment and thus constituted a breach of the License Agreement. If Appellants are correct, it follows that Rad Source's subsequent breach of the non-compete clause would not be excused by Nordion's first material breach, and thus Nordion would be entitled to damages because of Rad Source's breach of the non-compete clause. As explained more fully in Part III.F immediately below, we have decided that we must certify to the Florida Supreme Court the issue of whether Nordion's transfer of all of its rights to Best constituted an assignment and thus a breach of the License Agreement.

Second, Appellants also argue that – even if Nordion's transfer of its rights to Best constituted an assignment and thus the first material breach – Rad Source nonetheless waived any right to rely on, and was estopped from any right to rely on, Nordion's breach and thus that the district court erred in finding that Nordion's first, material breach excused Rad Source's breach. Nordion thus argues that it is in any event entitled to damages because of Rad Source's breach of the non-compete clause. Because we have decided there is a need to certify the

32

assignment-sublicense issue, and because that issue would not be dispositive of this appeal (and thus not certifiable) if Appellants are correct in their second argument, we turn now to decide the waiver-estoppel issue.[4]

Appellants argue that, even assuming Nordion's transfer to Best constituted the first, material breach, the district court nonetheless erred in finding that Nordion's breach excused Rad Source from complying with the non-compete clause. Appellants argue that Rad Source's awareness of the transfer to Best, and its failure to send a default notice, constituted an acquiescence in an alteration of the License Agreement, a waiver of Nordion's breach, and that Rad Source is therefore estopped from suing Nordion for damages on account of the breach. See Acosta v. Dist. Bd. of Trustees of Miami, Dade Comm. Coll., 905 So. 2d 226, 228-29 (Fla. Dist. Ct. App. 2005) (stating the rule of law: "Where a party fails to declare a breach of contract, and continues to perform under the contract after learning of the breach, it may be deemed to have acquiesced in an alteration of the terms of the contract, thereby barring its enforcement.")

We note that the issue of waiver is an issue of fact. See Rutig v. Lake Jem Land Co., 20 So. 2d 497, 498 (Fla. 1945) ("The question of waiver is usually one

---

[4]    Our discussion and resolution of this waiver issue of course assumes arguendo that the Florida Supreme Court will rule that Nordion's transfer of all of its rights to Best was an assignment, not a sublicense, and thus did constitute a first material breach of the License Agreement. If the Florida Supreme Court decides that Nordion's transfer to Best is a sublicense, and not an assignment, then of course, there would be no breach by Nordion, and the waiver issue we now discuss would be moot.

of fact for consideration by a trial jury on issues properly defined."); see also WSG

W. Palm Beach Dev. v. Blank, 990 So. 2d 708, 715 (Fla. Dist. Ct. App. 2008)

("The question of waiver is an issue of fact for which a trial judge's finding will be

reversed 'only if there is no competent, substantial evidence to support' it.")

(citations omitted).  We cannot conclude that the district court was clearly

erroneous in finding that Nordion's first material breach excused Rad Source's

actions in developing and marketing the RS 3400 System.  In other words, the

district court was not clearly erroneous in finding that Rad Source's own waiver

did not extend that far.

Waiver is commonly defined as the intentional or voluntary relinquishment

of a known right.  Fireman's Fund Ins. Co. v. Vogel, 195 So. 2d 20, 24 (Fla. Dist.

Ct. App. 1967); Sentry Ins. v. Brown, 424 So. 2d 780, 784 (Fla. Dist. Ct. App.

1982).  And while conduct may imply such waiver, the conduct relied upon to do

so must make out a clear case of waiver.  Taylor v. Kenco Chem. & Mfg. Corp.,

465 So. 2d 581, 587 (Fla. Dist. Ct. App. 1985); Fireman's Fund, 195 So. 2d at 24.

Indeed, "waiver does not arise merely from forbearance for a reasonable time."

Am. Somax Ventures v. Touma, 547 So. 2d 1266, 1268 (Fla. Dist. Ct. App. 1989)

(citing Cont'l Real Estate Equities, Inc. v. Rich Man Poor Man, Inc., 458 So. 2d

798, 799 (Fla. Dist. Ct. App. 1984)).  Under Florida law, a material breach excuses

a party from performance of the contract, although the injured party may waive the

34

breach. Post breach actions evidencing that the contract is still subsisting, if sufficiently clear, can satisfy the requirement that, when inferring waiver from conduct, "the conduct relied upon to do so must make out a clear case of waiver." Am. Somax Ventures, 547 So. 2d at 1268-69; accord Taylor, 465 So. 2d at 588 ("Taylor's conduct does not make out that requisite clear case which would show that he intended to relinquish his right."). Equitable estoppel requires that: (1) the party against whom estoppel is sought made a representation about a material fact that is contrary to a position it later asserts, and (2) the party seeking estoppel detrimentally relied on that representation. Watson Clinic, LLP v. Verzosa, 816 So. 2d 832, 834 (Fla. Dist. Ct. App. 2002).

Here, the evidence supports the district court's findings. Rad Source could not be said to have acted in a manner that showed it considered Nordion's sublicense not to be a breach. Quite the opposite is true. In December 2007, Nordion contacted Rad Source to tell Rad Source that it was exiting the blood irradiation business. Nordion sought Rad Source's consent to assign the License Agreement to Best. Rad Source responded that it refused to consent because it was not in Rad Source's best economic interest. But Rad Source asked for further documentation, which was never forthcoming. In a later conference call, Nordion threatened to sublicense to Best if Rad Source did not consent. Rad Source

35

objected, indicating that a sublicense would not be authorized.[5]  Rad Source also asserts that Nordion made a "veiled threat" that Rad Source could take on the wealthy owner of Best.  Although Rad Source did not send a notice of default, Rad Source did not act as if the transfer to Best without the required consent was valid.  Nordion has pointed to no acts of Rad Source's that furthered the performance by Rad Source of any obligation it had under the License Agreement and, quite inconsistent with its obligations under the License Agreement, Rad Source proceeded to develop and market the RS 3400 System in direct contravention of the non-compete agreement.

Appellants also argue, in conclusory fashion, that the district court's waiver decisions are contradictory.  We acknowledge some inconsistent language in the district court's opinion.  As noted above, in initially discussing waiver, the district court held that Rad Source had waived its claim for damages against Nordion because it was aware of the transfer but failed to send a notice of termination.  The district court also said Rad Source was not excused from future performance.  However, later in the same opinion, the district court squarely held that Rad Source was excused from its obligations under the non-compete clause because of Nordion's first material breach, thus precluding Nordion's claim for damages against Rad Source.  We construe the district court's opinion as finding that Rad

---

[5]    In addition, Rad Source promptly responded to Appellants' cease and desist letter of September 30, 2009.  Rad Source advised that Nordion had breached the License Agreement.

Source waived (and was estopped with respect to) its claim for damages against Nordion for having committed the first, material breach,[6] but Rad Source did not waive its right to rely on Nordion's first, material breach to excuse its breach of the non-compete clause (i.e., its actions in developing and marketing the RS 3400 system).

Although Appellants merely note that the district court's waiver rulings are contradictory and irreconcilable, without citing any authority that same might rise to the level of reversible error, we note that, under Florida law, "[t]here is a distinction between a waiver of the right to treat a contract as discharged and a waiver of a right of action for damages for the breach." Rutig, 20 So. 2d at 498. Although we acknowledge some inconsistency in the district court's language, it is reconcilable.[7] Moreover, as noted above, the waiver issue is an issue of fact; waiver and estoppel rulings are also applications of equitable principles. The district court's resolution of these issues, after an extended bench trial, reflects sound common sense and an entirely appropriate application of equitable

---

[6]    Because Rad Source does not challenge on appeal the district court's waiver ruling to the extent it barred Rad Source's own claim for damages against Nordion, that issue is not before us. The same is true with respect to the district court's ruling that Rad Source was not excused from its obligation to offer Nordion the right of first negotiation with respect to the RS 3400 (an issue which was mooted in any event by another district court holding which we affirm summarily in the last footnote of this opinion).

[7]    Because the apparent inconsistency is reconcilable, we can assume arguendo that the district court did not err in ruling that Rad Source waived its claim for damages against Nordion. As noted in the preceding footnote, that issue is not before us.

principles, serves the interests of justice, and leaves the parties in the status quo with respect to damages. Rad Source should not be able to collect damages against Nordion when delay by Rad Source in formally repudiating the License Agreement allowed damages to accumulate. On the other hand, it is eminently fair not to subject Rad Source to damages when it opted to develop and market the RS 3400 after its chosen licensee, Nordion, breached the License Agreement and exited the business.[8]

---

[8]    We respectfully disagree with our dissenting brother's criticism of the majority opinion as an inappropriate reconstruction of the district court's finding of fact with respect to the scope of Rad Source's waiver of Nordion's first, material breach. The dissent acknowledges that waiver is an issue of fact. Dissent, __ F.3d at __. The dissent relies upon and quotes language that appeared in the district court's opinion at 79 and 80. However, the dissent ignores the language and the holding of the district court at 89, to wit:

> I find that Plaintiffs cannot recover on these claims because as described supra, Nordion breached the License Agreement first by sublicensing all of its rights to Best. . . . As explained supra, I determined that Rad Source had a right to market its RS 3400 because Nordion breached the License Agreement first by sublicensing all its rights to Best.

Harmonizing the acknowledged inconsistent language, we construe the district court's opinion to determine its most plausible meaning. We construe the district court's findings – with respect to the factual issue of the scope of Rad Source's waiver – as finding that Rad Source waived its claim for damages from Nordion, but not its right to rely on Nordion's breach to insulate it from Nordion's claim for damages from Rad Source. Contrary to the suggestion of the dissent, our construction of the meaning of the district court's opinion is a process regularly employed by appellate courts. Unlike the dissent, which effectively nullifies the language it does not prefer, we harmonize the two apparently inconsistent statements to arrive at what we believe is the true meaning of the district court's opinion. Our construction – but not that of the dissent – implements the very clear bottom line of the district court opinion – i.e. its ruling that neither Nordion nor Rad Source is entitled to damages. We also respectfully disagree with the dissent's criticism of our alleged justifications for our interpretation; in light of the fact that waiver is a factual issue imbued with equitable principles, we believe it entirely appropriate to employ common sense and a sense of the justice of the factual situation.

Under these circumstances, we reject Appellants' challenge to the district court's application of waiver/estoppel principles.  Assuming that the Florida Supreme Court holds that Nordion's transfer of all of its rights to Best did constitute an assignment and therefore did constitute the first material breach, we reject Appellants' challenge to the district court's ruling barring Nordion's damage claim against Rad Source.[9]  We cannot conclude that the district court's rulings were clearly erroneous.

F.    Did Nordion Breach the License Agreement When It Transferred Its Rights to Best?

Again raising a state-law contract issue, Appellants argue that the district court erred when it concluded that Nordion breached the License Agreement by sublicensing its right to Best.  The district court determined that because Nordion

---

[9]    As an alternative holding to its ruling that Nordion's first, material breach excused Rad Source's subsequent breach of the non-compete clause, the district court also held that Nordion had no standing to claim damages for Rad Source's breach because – even assuming a permitted sublicense to Best – Nordion had exited the irradiation business.  The district court held that any lost sales would belong to Best – not Nordion – and the district court held that Best lacked standing because it was not a third party beneficiary of the License Agreement.  We disagree with the district court's ruling that Nordion lacks standing for this reason.  If the Florida Supreme Court should hold that Nordion's transfer to Best was a sublicense (and thus not a first, material breach), we hold that, as a sublicensor, Nordion has standing to enforce its rights under the License Agreement.  While we agree with the district court that Best is not a third party beneficiary, as sublicensee, it could sue its licensor (Nordion) for any damages resulting from Rad Source's violation of the non-compete clause, and Nordion would have standing to sue Rad Source.  In light of our resolution of this final issue, the assignment-sublicense issue is dispositive of this appeal.  If the Florida Supreme Court holds that the transfer to Best is an assignment and therefore the first, material breach, then neither Nordion nor Best have any claim for damages against Rad Source for its breach of the non-compete clause.  On the other hand, if the Florida Supreme Court holds that the transfer to Best is a true sublicense, and thus not a breach of the contract, then Nordion does have standing to sue Rad Source for appropriate damages resulting from Rad Source's breach of the non-compete clause.

39

conveyed to Best substantially all of its interests under the License Agreement, the sublicense agreement was tantamount to an unconsented-to assignment.

Because we are uncertain of the proper resolution of this issue, a majority of this panel has decided to certify the issue to the Florida Supreme Court. In the following discussion, we summarize briefly the competing arguments of the parties. The arguments in favor of treating the transfer from Nordion to Best as a sublicense – the argument favoring Appellants – is amply set forth in the dissent, and will not be repeated here. We set out below the argument in favor of treating the transfer as an assignment – the argument favoring Rad Source.

Under Florida law, an assignment requires "a transfer of all the interests and rights to the thing assigned." Lauren Kyle Holdings, Inc. v. Health-Peterson Constr. Corp., 864 So. 2d 55 (Fla. Dist. Ct. App. 2003). On the other hand, the Florida Supreme Court has also stated that "[t]he form of an assignment of lease is immaterial; its character in law being determined by its legal effect." C.N.H.F., Inc. v. Eagle Crest Dev. Co., 128 So. 844, 845 (Fla. 1930). Here, the evidence shows that Nordion and Best entered into an agreement with assignment in mind and only when Rad Source refused to consent to the assignment did Appellants decide to treat the transfer as a sublicense. For these reasons, Rad Source argues that the document is in substance an assignment, because Nordion has assigned all

of its rights to Best, excepting only the retention of one day at the end of the term of the License Agreement.

We have not been able to locate any Florida cases that address a situation like this one. The cases cited by the dissent are all distinguishable and none involve a situation where the subcontracting parties sought an assignment but upon failing to garner the requisite consent, created a sublicense that retained solely a single day and no other rights. Turning first to Lauren Kyle, the dissent's strongest case for sublicense, we note that in that case, there was no attempt by Sago, the party seeking to sublicense, to obtain consent from Peterson, the other party, before it transferred to Sunland, the purported sublicensee. Thus, there was no indication of an attempt to create an assignment that was rebuffed, as there was here. The transfer in Lauren Kyle may well have been mere inadvertence, and certainly was not a blatant attempt to circumvent the consent requirement, as there was here. More significantly, the court in Lauren Kyle never mentioned the parties' intent, or whether the transfer contravened the intention of the parties. Finally, the Lauren Kyle court saw the transfer as contemplating the continuing involvement of Sago. See Lauren Kyle, 864 So. 2d at 58 ("Sago did not transfer to Sunland the right to purchase lots from Peterson; Sunland only obtained the right to purchase lots from Sago."). In other words, the parties contemplated that Sago would continue to buy lots from Peterson, and then sell the same to Sunland. By contrast, the parties to

41

the conveyance from Nordion to Best contemplated no further involvement by Nordion; it transferred its entire interests (save only one day) and completely got out of the business. There was nothing left for Nordion to do with respect to Rad Source.

We note that none of the other cases that the dissent cites involve a situation of rebuffed attempt at assignment. Further, none involve the retention of an inconsequential term of the contract, when the sublicensing party completely divested itself of the business. Instead, most just cite the rule as stated in Lauren Kyle and have facts quite dissimilar to this case. See Cont'l Cas. Co. v. Ryan Inc. E., 974 So. 2d 368 (Fla. 2008) (discussing the difference between an assignment and an equitable subrogation); C.N.H.F., 128 So. 844 (holding that all rights in a lease were transferred so it was an assignment); Leesburg Cmty. Cancer Ctr. v. Leesburg Reg'l Med. Ctr., 972 So. 2d 203 (Fla. Dist. Ct. App. 2007) (finding a sublease where subleasor retained the ground lease and ability to sell that interest); Price v. RLI Ins. Co., 914 So. 2d 1010 (Fla. Dist. Ct. App. 2005) (reciting Lauren Kyle for rule about assignment without any discussion); Dep't of Rev. v. Bank of Am., 752 So. 2d 637 (Fla. Dist. Ct. App. 2000) (discussing rights of assignee to stand in shoes of assignor); Estate of Basile v. Famest, Inc., 718 So. 2d 892 (Fla. Dist. Ct. App. 1998) (holding an expired personal guaranty did not transform assignment into a sublicense).

42

Because we are uncertain how the Florida courts would interpret this situation, we certify the following question to the Florida Supreme Court, pursuant to Fla. Const. art. V, § 3(b)(6):

> When a licensee enters into a contract to transfer all of its interests in a license agreement for an entire term of a license agreement, save one day, but remains liable to the licensor under the license agreement, is the contract an assignment of the license agreement, or is the contract a sublicense?[10]

The phrasing of this certified question should not restrict the Florida Supreme Court's consideration of the problem posed by this case. This extends to the Florida Supreme Court's restatement of the issues and the manner in which the answer is given. In order to assist consideration of the case, the entire record, along with the briefs of the parties, shall be transmitted to the Florida Supreme Court.

## IV.  CONCLUSION

For the foregoing reasons, we conclude that we do have appellate jurisdiction, and we resolve dispositive issues in favor of Rad Source,[11] leaving a

---

[10]    Although the parties have not raised it, the Florida Supreme Court may want to consider the question of whether the agreement was an equitable assignment. See Adams v. Fid. & Cas. Co. of N.Y., 920 F.2d 897, 900 n.6 (11th Cir. 1991) (suggesting unraised argument to Florida Supreme Court in a certified question context).

[11]    We summarily reject Appellants' argument that Rad Source breached the License Agreement by failing to extend the right of first negotiation with respect to the RS 3400 System. Even if we assume arguendo that there was a breach, the district court held that the breach was cured post-trial. On appeal, Appellants purport to challenge only the district court's cure finding. We reject Appellants' challenge summarily. Appellants did not adequately preserve the

43

single dispositive issue for certification.  We affirm in part and certify a question to

the Florida Supreme Court with respect to the assignment-sublicense issue.

AFFIRMED in part, and QUESTION CERTIFIED.

---

argument in the district court.  For this reason, and also because of the conclusory manner of
Appellants' argument on appeal, we deem the argument abandoned.

Any other arguments made by Appellants on appeal are rejected without need for
discussion.

PRYOR, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority opinion that we have jurisdiction to decide this appeal, that Article 3.1 is not ambiguous, and that the third sentence of Article 3.1 does not preclude Rad Source from the development or marketing of the RS 3400 because the RS 3400 does not embody, in whole or in part, the patents. I also agree that the district court did not clearly err when it found that the failure of Rad Source to maintain the '255 patent was not a material breach of the agreement and that Rad Source did not unreasonably refuse consent to the proposed assignment of the license agreement from Nordion to Best.

But the rest of the majority opinion makes no sense. The majority opinion certifies a question to the Supreme Court of Florida that is controlled by a bright-line rule that has been uniformly followed by Florida courts and suggests to the Supreme Court of Florida that it might wish to consider another question that was never raised, briefed, or argued by any party. The majority opinion then invents out of whole cloth a justification for an internally inconsistent decision of the district court about standing to seek damages. Because I cannot agree with these aspects of the majority opinion, I respectfully dissent.

1. *Florida Law Is Clear that the Agreement Between Nordion and Best Is a Sublicense.*

The uniform precedent of Florida courts confirms that the agreement between Nordion and Best constituted a sublicense, not an assignment. The first

45

question that the majority certifies to the Supreme Court of Florida is whether the agreement between Nordion and Best, in which Nordion transfers to Best "an exclusive right and sublicense . . . to Use the Licensed Technology for the System and for the single power supply version of the System, in the Territory all on the terms and conditions contained in the License Agreement" for a period of time "equal to the term of the License Agreement less one (1) day," constitutes an assignment or a sublicense as a matter of law. Florida courts follow the traditional rule at common law that an assignment is an agreement that transfers all rights and duties under a contract and a sublicense is an agreement that transfers something less than all of the rights and duties. Under Florida law, "the criterion for determining whether a transfer in the form of a lease constitutes an assignment or a sublease is whether the entire interest in the term is transferred without a reversion being retained by the original lessee." C.N.H.F., Inc. v. Eagle Crest Dev. Co., 128 So. 844, 845 (Fla. 1930); see Estate of Basile v. Famest, Inc., 718 So.2d 892, 892 (Fla. Dist. Ct. App. 1998). Florida appellate courts have applied the principle that "[a]n assignment is a transfer of all the interests and rights to the thing assigned" in several contexts, including the lease of rental property, the assignment of automobile financing contracts, and a real estate contract for the sale of lots. See, e.g., Leesburg Cmty. Cancer Ctr. v. Leesburg Reg'l Med. Ctr., 972 So. 2d 203, 206 (Fla. Dist. Ct. App. 2007); see also Price v. RLI Ins. Co., 914 So. 2d 1010, 1013

46

(Fla. Dist. Ct. App. 2005); Lauren Kyle Holdings, Inc. v. Heath-Peterson Constr. Corp., 864 So. 2d 55, 58 (Fla. Dist. Ct. App. 2003); Dep't of Rev. v. Bank of Am., N.A., 752 So. 2d 637, 642 (Fla. Dist. Ct. App. 2000); Estate of Basile, 718 So. 2d at 892–93. And the Supreme Court of Florida has twice endorsed this principle. Continental Cas. Co. v. Ryan Inc. E., 974 So. 2d 368, 376 (Fla. 2008); C.N.H.F., Inc., 128 So. at 845.

Florida courts use a bright-line rule to distinguish an assignment from a sublease in part because the two have different consequences for the original obligor on the contract. If the entire interest in the contract has been transferred, the assignee "stands in the shoes of the assignor and may enforce the contract against the original obligor in his own name." Lauren Kyle, 864 So. 2d at 58; see also C.N.H.F., Inc, 128 So. at 845. The assignor is no longer liable on the original contract and retains no rights to enforce the contract after its assignment. Lauren Kyle, 864 So. 2d at 58; Estate of Basile, 718 So. 2d at 892–93. By contrast, a sublicensor remains liable on the original contract and retains the right to enforce that contract against the other party. See Lauren Kyle, 864 So. 2d at 58. A sublicensee cannot enforce a contract against the original contracting party, but must instead sue the sublicensor for any breach of contract by the other original contracting party. See id.

Under Florida law, the agreement between Nordion and Best is a sublicense because Nordion did not grant all of its rights to Best. The term of the sublicense given was for a period of time equal to the term of the license agreement, less one day. Nordion also retained the right to use the licensed technology after the conclusion of the original license agreement without any further obligations to Rad Source. Because Nordion retained some of its initial rights under the license agreement, the agreement between Nordion and Best is a sublicense as a matter of Florida law. The district court clearly erred when it found that Nordion breached the license agreement when it entered its agreement with Best because the agreement, as a matter of law, was not an assignment. I would not certify to the Supreme Court of Florida a question controlled by a bright-line rule that has been uniformly followed by the appellate courts of Florida and twice approved by the Supreme Court of Florida. See Silverberg v. Paine, Webber, Jackson & Curtis, Inc., 710 F.2d 678, 690 (11th Cir. 1983) ("A federal court applying state law is bound to adhere to decisions of the state's intermediate appellate courts absent some persuasive indication that the state's highest court would decide the issue otherwise.").

The majority opinion does not offer any decision from a Florida court to support its contention that the Florida courts might not apply the bright-line rule that distinguishes an assignment from a sublicense to the agreement between

Nordion and Best.  Instead, the majority opinion decides to certify the question because no Florida cases address a situation precisely like this one.  But the purpose of a bright-line rule is to promote certainty and judicial efficiency by providing guidance for courts faced with factually disparate situations.  These benefits of a bright-line rule are undermined when we certify a question to the Supreme Court of Florida about whether to apply a bright-line rule to a particular contract situation, when the Florida courts have uniformly applied it to all contract cases.  See, e.g, Lauren Kyle, 864 So. 2d at 58.

The majority opinion also expresses concern that no Florida court has applied the bright-line rule to a case that "involve[s] a situation of rebuffed attempt at assignment," Majority Opinion at 42, but this concern reflects a failure to respect the freedom of contract.  Nordion and Rad Source, two sophisticated parties, negotiated for over a year to create the license agreement at issue in this appeal, and their negotiations included active discussion of the sublicense right contained in the agreement.  Both parties received the advice of counsel before they signed the agreement.  And the Chief Executive Officer of Rad Source, Randal Kirk, testified that he knew when he signed the license agreement that it did not limit the sublicense right to specific purposes and that he "had agreed to a broader sublicense than had been reflected in prior documents."  When Rad Source refused to consent to an assignment of the license agreement and Nordion entered its

49

sublicense agreement with Best, the benefit of this bargain over the right to sublicense was realized by both parties:  Nordion was able to accomplish many of the same objectives through a broad sublicense, but Rad Source retained its ability to hold Nordion liable on the license agreement for any future breaches of the agreement by Best.  Nothing in Florida law suggests that a court should later ignore the parties' reliance on a well-established bright-line rule to rewrite the contract they freely negotiated.

The majority opinion also suggests in a footnote that the Supreme Court of Florida may wish to consider whether the doctrine of equitable assignment should apply to this matter, but no party has raised that issue and the question does not appear to have any merit under Florida law.  We have repeatedly held that arguments not raised before the district court and in the initial brief of a party on appeal will not be considered on appeal because they fall outside the scope of appellate review and consideration of them would undermine the adversarial process.  See Access Now, Inc. v. Sw. Airlines Co., 385 F.3d 1324, 1330–31 (11th Cir. 2004).  Aside from the fundamental problem of ignoring the scope of our review, the majority opinion fails to explain why a doctrine, under Florida law, to effectuate the intent of contracting parties should be used to frustrate the intent of Nordion and Best, both of which entered the sublicense agreement with the intent to comply with the consent provision of the license agreement.  See Morrow v.

50

Commonwealth Life Ins. Co., 159 So. 525, 526 (Fla. 1935) ("[C]ourts of equity have long since disregarded the ancient common-law rule against recognition of assignments of choses in action in actions at law, by recognizing certain kinds of actually executed assignments as valid equitable assignments, which equity should recognize and protect in an equitable suit where that is necessary to effectuate the plain intent of the parties and to hold otherwise would be unjust."); Source Track, LLC v. Ariba, Inc., 958 So. 2d 523, 526 (Fla. Dist. Ct. App. 2007) ("A court may find an equitable assignment where necessary to effectuate the parties' plain intent or to avoid injustice."); Giles v. Sun Bank, N.A., 450 So. 2d 258, 260 (Fla. Dist. Ct. App. 1984) ("No particular words or form of instrument is necessary to effect an equitable assignment and any language, however informal, which shows an intention on one side to assign a right or chose in action and an intention on the other to receive, if there is a valuable consideration, will operate as an effective equitable assignment.").  Neither Nordion nor Best intended their agreement to operate as an assignment, and the only party that would benefit from construing the sublicense agreement in that way is Rad Source.  The parties to this agreement would surely be surprised to see the doctrine of equitable assignment invoked here, so unmoored from its theoretical foundation and the record of the appeal.

51

## 2. *Nordion Is Entitled to an Opportunity to Prove Damages.*

The majority opinion also invents an argument to reconcile the internally inconsistent rulings of the district court on the issue of standing to seek damages. Although the district court found that Rad Source had waived both its claim for breach of contract based on the agreement between Nordion and Best and its right to use that breach as an excuse from further performance of the contract, the district court nevertheless concluded that Nordion lacked standing to seek damages for a later breach of the license agreement by Rad Source. But hornbook law on contracts establishes that this conclusion is in direct conflict with the factual findings about waiver and estoppel: "There are few principles of contract law better established, or more uniformly acknowledged, than the rule that when a contract not fully performed on either side is continued in spite of a known excuse, the right to rely upon the known excuse is waived; in turn, the defense based on the excuse is lost and the party who would otherwise have been excused is liable if he or she subsequently fails to perform." 13 Williston on Contracts § 39:31 at 639–40 (4th ed. 2000). I agree with Nordion that "[t]here is simply no way to reconcile" the findings about waiver and estoppel with the ruling that Nordion lacked standing. And I agree with Nordion that, because Rad Source did not appeal the adverse factual findings by the district court, we cannot "resurrect" a breach that

52

has been waived "to serve as the 'first breach' and thereby deny [Nordion] the right to recover damages for Rad Source's breaches."

The majority opinion creatively reconstructs the opinion of the district court "as finding that Rad Source waived (and was estopped with respect to) its claim for damages against Nordion for having committed the first, material breach, but Rad Source did not waive its right to rely on Nordion's first, material breach to excuse its breach of the non-compete clause (i.e., its actions in developing and marketing the RS 3400 system)." Majority Opinion at 36–37. The district court said no such thing, and we have no authority to reconstruct the findings by the district court in this manner. The district court explained as follows that Rad Source had waived any claim that it had for breach of contract by Nordion when it failed to object, as it was required to do under the contract, to the completion of the agreement between Nordion and Best:

> Rad Source waived its claim that Nordion breached the License Agreement by improperly assigning the License Agreement or by entering into a sublicense with the Best Plaintiffs. Rad Source was at all times fully aware that Best was manufacturing and selling the Raycell, yet never notified Nordion of any alleged material breach of the License Agreement, and failed to terminate the License Agreement in accordance with Article 12.2 of the License Agreement.

The majority opinion asserts too that "the district court [nevertheless] found that Rad Source's breach was excused because of Nordion's previous, first material

53

breach thereof, thus freeing Rad Source to market the RS 3400." Majority Opinion at 31–32. But the district court explicitly rejected that contention as follows:

> I disagree with Rad Source's contention that [Nordion] breached the License Agreement which therefore excused Rad Source from further performing its obligations under the License Agreement. In fact, I determine that the License Agreement remains operative until the expiration of the contract on its terms, i.e., until the expiration of the final patent in the year 2022.

And the district court explained as follows that Rad Source was equitably estopped from asserting an excuse for future nonperformance for similar reasons:

> Rad Source is estopped from asserting, as a basis for termination or as an excuse for its own breaches of contract, that Nordion breached the License Agreement by improperly assigning or sublicensing the License Agreement to Best. Rad Source cannot claim that Nordion's breach excused Rad Source from performing its obligations under the License Agreement based on Rad Source's silence and inaction after being notified and/or becoming aware that Best was manufacturing and selling the Raycell.

The opinion of the district court cannot be read, as the majority opinion asserts, to find that "Rad Source did not waive its right to rely on Nordion's first, material breach to excuse its breach of the non-compete clause (i.e., its actions in developing and marketing the RS 3400 system)." Majority Opinion at 36–37.

The majority opinion betrays its creative reconstruction of the facts when it "acknowledge[s] some inconsistent language in the district court's opinion," but "construe[s] the district court's opinion" as finding waiver only of a claim for damages, not of the right to treat the agreement as excused. Id. at 36. The

majority opinion also asserts that its "harmoniz[ation] [of] the two apparently inconsistent statements [in the opinion] arrive[s] at what [it] believe[s] is the true meaning of the district court's opinion." Id. at 38 n.8.  In other words, the majority opinion forgives the district court for reaching a decision inconsistent with its underlying findings by reconstructing those findings altogether.  Yet the majority opinion contradicts itself in a footnote, where it acknowledges that, for the same reasons that the district court found that Rad Source waived its claim for breach of contract, "the district court also said that Nordion's first material breaches did not excuse Rad Source from future performance under the License Agreement." Id. at 31 n.3.  And the majority opinion then defends its reconstruction of the findings on the ground that "it is eminently fair not to subject Rad Source to damages when it opted to develop and market the RS 3400 after its chosen licensee, Nordion, breached the License Agreement and exited the business." Id. at 38.

The majority opinion's reconstruction of the findings about waiver is inconsistent with the notion that any waiver occurred at all.  Even as it purports to affirm the factual findings by the district court that Rad Source waived its right to seek damages for any breach of the agreement by Nordion, the majority opinion asserts that "Rad Source could not be said to have acted in a manner that showed it considered Nordion's sublicense not to be a breach." Id. at 35.  And the majority opinion asserts that "Rad Source did not act as if the transfer to Best without the

55

required consent was valid" and that "Nordion has pointed to no acts of Rad Source's that furthered the performance by Rad Source of any obligation it had under the License Agreement." Id. at 36. But those assertions are inconsistent with the finding of the district court that Rad Source waived the breach when it learned that Nordion entered the agreement with Best in May or June 2008 and did not send a notice of default to Nordion until January 2011.

The majority opinion compounds its error when it uses its reconstructed findings to employ a more deferential standard of review of those findings. The majority opinion reviews for clear error its reconstructed findings that Rad Source "waived (and was estopped with respect to) its claim for damages against Nordion for having committed the first, material breach, but Rad Source did not waive its right to rely on Nordion's first, material breach to excuse its breach of the non-compete clause (i.e., its actions in developing and marketing the RS 3400 system)." Id. at 34, 36–37. But the question whether the doctrine of first breach applied to bar Nordion from proving damages when Rad Source waived the breach is a question of law, which we should review de novo. See Williston on Contracts § 63:3 at 438, 447–48 (4th ed. 2002). The majority opinion argues that we should view the question as one of fact because the district court used the word "find" when it determined that Nordion could not recover damages, Majority Opinion at 38 n.8, but we are not bound by that loose language to treat its legal conclusion as

56

a finding of fact.  As I have already explained, the existence of a waiver is an issue of fact, but the effect of that waiver is an issue of law.

The district court committed an error of law when it denied Nordion an opportunity to prove damages from the breach of the non-compete clause by Rad Source.  The district court concluded that "neither party demonstrated that it was entitled to damages from the other as a matter of law" and explained that Nordion was barred from recovering damages because "Nordion breached the License Agreement first by sublicensing all of its rights to Best."  See 17B C.J.S. Contracts § 752 at 199 (2011) ("The effect of a material or substantial breach of contract is, generally, to preclude the party guilty of the first such breach from recovering on the contract and to render him or her liable to the injured party for the resulting loss or injury.").  But under Florida law, "[w]here a party fails to declare a breach of contract, and continues to perform under the contract after learning of the breach, it may be deemed to have acquiesced in an alteration of the terms of the contract, thereby barring its enforcement."  See Acosta v. Dist. Bd. of Trs. of Miami-Dade Cmty. Coll., 905 So. 2d 226, 228–229 (Fla. Dist. Ct. App. 2005) (internal quotation marks omitted)).  Because Rad Source waived its right to declare a breach of contract, the district court should have concluded that Rad Source acquiesced in the alteration of the license agreement and that Nordion had

57

standing, as a matter of law, to seek damages for the later breach of that license agreement by Rad Source.

The majority opinion's failure to conduct this analysis is puzzling given that it treats the two other issues of standing resolved by the district court, in the section of its opinion entitled "Lack of Standing," as issues of law. After it concluded that Nordion lacked standing to seek damages because it committed the first material breach of the agreement, the district court concluded that Nordion also lacked standing to seek damages because it had exited the irradiation business and that Best lacked standing to seek damages because it was not a third-party beneficiary of the license agreement. The majority opinion rejects the first determination, but agrees with the second determination. The majority opinion treats both issues as legal questions about standing as follows:

> As an alternative holding to its ruling that Nordion's first, material breach excused Rad Source's subsequent breach of the non-compete clause, the district court also held that Nordion had no standing to claim damages for Rad Source's breach because – even assuming a permitted sublicense to Best – Nordion had exited the irradiation business. The district court held any lost sales would belong to Best – not Nordion – and the district court held that Best lacked standing because it was not a third party beneficiary of the License Agreement. We disagree with the district court's ruling that Nordion lacks standing for this reason. If the Florida Supreme Court should hold that Nordion's transfer to Best was a sublicense (and thus not a first, material breach), we hold that, as a sublicensor, Nordion has standing to enforce its rights under the License Agreement. While we agree with the district court that Best is not a third party beneficiary, as sublicensee, it could sue its licensor (Nordion) for any damages

> resulting from Rad Source's violation of the non-compete clause, and Nordion would have standing to sue Rad Source.

Majority Opinion at 39 n.9.  The majority opinion's treatment of these latter issues about standing as pure questions of law is irreconcilable with its treatment of the decision that Nordion lacked standing because it committed the first material breach as a factual issue about waiver.  I agree with the majority opinion that, as a sublicensor, Nordion remains in privity of contract with Rad Source and is entitled to enforce the license agreement and that, as a sublicensee, Best lacks standing to enforce the license agreement against Rad Source.  But I cannot understand the majority opinion's treatment of the first issue of Nordion's standing as a factual issue to be reviewed for clear error.

The majority opinion asserts that its "construction of the meaning of the district court's opinion is a process regularly employed by appellate courts," id. at 38 n.8, but I disagree.  We regularly construe legal texts, such as statutes and contracts, to determine their meaning, but we do not construe district court opinions to save them from reversal.  See generally Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts (2012).  We instead read opinions of district courts only for what they say.  We should not rewrite an opinion of 105 pages to cure its errors of law and internal inconsistencies because we like the result.  Our concern should not be with "implement[ing] the very clear

bottom line of the district court opinion," <u>see</u> Majority Opinion at 38 n.8, but instead with applying the law.

*Conclusion*

I would not certify any questions to the Supreme Court of Florida in this appeal. I would instead affirm in part, reverse in part, and remand to give Nordion an opportunity to prove damages from the breach of the non-compete clause by Rad Source. Florida courts have uniformly applied the traditional rule that an assignment transfers all rights and duties in a contract and a sublicense transfers only a portion of those rights, and I would apply that rule to conclude that Nordion did not breach the license agreement when it entered a sublicense with Best. And even if Florida law were unclear on this point, which it is not, we could resolve this appeal based on the unchallenged findings about waiver, which establish that Nordion has a legal right to seek damages for the breach of the non-compete clause by Rad Source. Instead of following these settled legal principles, the majority opinion defends its ruling as follows based on the result: "The district court's resolution of these issues, after an extended bench trial, reflects sound common sense, serves the interests of justice, and leaves the parties in the status quo with respect to damages." <u>Id.</u> at 37–38. Because we are bound by the law, not by personal reflections of what might be equitable between two sophisticated parties

60

to a contract, and because our review is limited by both the record and the issues

raised by the parties, I respectfully dissent.